**UNITED STATES of America,**

v.

**Mike KOKOSKI.**

**Crim. A. No. 5:92–00090.**

United States District Court,
S.D. West Virginia,
at Beckley.

May 6, 1994.

As corrected May 9, 1994.

Mike Kokoski, in person.

David White, for defendant.

Victoria Major, Asst. U.S. Atty., for U.S.

### *ORDER*

HALLANAN, District Judge.

On March 30, 1994, the defendant appeared in person and by counsel, David White, Esquire, for a competency hearing pursuant to 18 U.S.C. § 4247(d). The United States was represented at the hearing by Victoria Major, Assistant United States Attorney.

### *BACKGROUND*

On March 31, 1992, the defendant was charged in a single-count indictment with possession with intent to distribute lysergic acid diethylamide (LSD) and marijuana. On July 15, 1992 the United States filed a four-count superseding indictment charging the defendant with conspiracy to distribute LSD and marijuana; two counts of distribution of LSD to a person under 21 years of age; and,

that he employed a person under 18 years of age to distribute LSD.

The defendant has been in custody since his March 9, 1992 arrest. He qualified for court appointed counsel and Thomas K. Patterson, Esquire, was assigned to represent him. At his arraignment on the original charges on April 14, 1992, the defendant entered a voluntary plea of not guilty and the case was set for trial on June 4, 1992.

On April 20, 1992, the defendant filed a *pro se* motion for change of counsel asserting that Mr. Patterson was only a general practice lawyer, had never tried a federal case before a jury, was not well acquainted or versed in the federal law or procedure, that Mr. Patterson's office was too far and that Mr. Patterson's office would not accept the defendant's phone calls. The *pro se* motion also included the following plea:

> Dear Sir, my case is complex, the punishment relating to the charges are serveare [sic]. I feal [sic] that compent [sic] exsperanced councel [sic] should be appoined [sic] me. I need councel that sepecilizes [sic] in federal law, and procedures not divorce court!

*Pro Se Motion,* Document No. 5 in case file. On April 22, 1992, Mr. Patterson filed a motion to withdraw. At a hearing on April 24, 1992, the defendant withdrew his *pro se* motion and stated that he was no longer opposed to representation by Mr. Patterson.

By Renewed Motion For Continuance, filed by the defendant's counsel on May 22, 1992 and granted, the trial was continued until July 15, 1992.

On June 26, 1992, David White, Esquire, filed a Notice of Appearance followed on June 30, 1992 by Mr. Patterson's Motion For Substitution of Counsel. The defendant had retained the services of David White, Esquire, to represent him in this matter.[1] By Order entered July 2, 1992, Mr. Patterson was granted leave to withdraw and the trial was continued until August 18, 1992 on motion of the United States.

At his arraignment on July 28, 1992 on the superseding indictment, the defendant entered a plea of not guilty to the charges. Because the charges in the superseding indictment were substantially different from those in the original indictment, the Court rescheduled the trial for September 22, 1992 with a motions hearing set for September 11, 1992. However, the trial and the motions hearing dates were changed to accommodate both parties, the trial being rescheduled for September 15, 1992 and the motions hearing rescheduled for September 8, 1992.

At the onset of the scheduled pretrial motions hearing on September 8th, Mr. White requested a determination of the defendant's mental competency to stand trial based on the defendant's refusal on a number of occasions to take the advice of his counsel, which Mr. White believed was the result of the defendant's inability to fully understand the nature of the proceedings against him and the manner in which the defendant was required to conduct himself.

The motion was granted and the defendant was delivered to FCI, Butner, North Carolina, for a competency evaluation pursuant to 18 U.S.C. § 4241.

The following is a chronological sequence of events which led to the hearing on March 30, 1994:

On September 11, 1992, the defendant was delivered to FCI, Butner, North Carolina (Butner) for a study and evaluation. By Order entered October 1, 1992, at the request of FCI, Butner, the thirty day evaluation period was extended for 15 days. 18 U.S.C. § 4241. That evaluation was completed and the defendant was returned to this district.

On November 5, 1992 the Court conducted a competency hearing. Pursuant to the report from Butner, without objection by either party and without either party presenting any additional evidence regarding competency, the Court found that the defendant was incompetent. However, the Court also

---

1. Because the defendant had previously qualified for court-appointed counsel, the Court required the defendant to show cause why he should not be required to reimburse the Criminal Justice Act Fund for the attorney's fee accumulated by Mr. Patterson. This was done to the satisfaction of the Court.

found, based upon the belief of the treatment team at Butner, that there was a substantial probability that in the foreseeable future he would attain the capacity to permit the trial to proceed. Therefore, the defendant was committed to the custody of the Attorney General for four months.[2]

On March 1, 1993, the Court received a letter from Butner, accompanied by an Annual Forensic Update, requesting that the treatment period be extended for an additional four months. The report represented that there was a substantial probability that in the foreseeable future, the defendant would attain the capacity to permit the trial to proceed. Pursuant to that representation, by Order entered March 1, 1993, the Court granted Butner's request and the study period was extended for an additional four months.

On June 21, 1993 the Court received copy of a report from FCI, Butner which indicated that the defendant had not been restored to competency. The defendant was again returned to this district, a competency hearing was held on July 7, 1993 and it was determined that the defendant would be returned to Butner for further study and with the goal of restoring the defendant to competency. The Court again found that there was a substantial probability that in the foreseeable future, the defendant would attain the capacity to permit the trial to proceed. Thus, the defendant was returned to Butner.

Because Butner had made two requests for additional four month treatment periods, the Court, by Order entered July 23, 1993, set a ninety day time frame for Butner to either restore the defendant to competency, find him incompetent now and/or at the time of alleged offenses, and if incompetent, whether he presents a danger to society.[3]

On September 24, 1993 Butner filed its report.

Having had the opportunity to observe the defendant at length, approximately 12 months, the treatment team at Butner, concluded that the defendant was competent:

> It is our opinion that Mr. Kokoski is now competent to stand trial. The antipsychotic medication he is currently taking appears to be helpful to him in organizing his thoughts and reducing the intensity of his psychotic symptoms. Based on his functioning in the Competency Restoration Group, it appears that he has an understanding of the nature and proceedings of the courtroom. While he continues to describe beliefs that he has special knowledge of a conspiracy headed by Adolph Hitler clones, the Forensic Team no longer views these as a psychotic delusions that keep him from working with his attorney. Rather, these ideas are seen as exaggerations of his idiosyncratic religious beliefs that do not interfere with his understanding of the Court process or his ability to work with his attorney to assist in his defense if he so chooses.

*Forensic Update, FCI, Butner, North Carolina September 15, 1993* at 12.

The September 15, 1993 report was accompanied by a Certification Of Restoration Of Competency To Stand Trial.[4]

With receipt of Butner's final report, on September 27, 1993 the Court conducted another competency hearing. However, at the outset of the hearing, the defendant, through counsel, objected to, and challenged, Butner's conclusion. Then, he requested a hearing and an opportunity to cross examine the persons who made this conclusion. 18 U.S.C. § 4247(d).

Thereupon, the United States moved to subpoena members of the treatment team.

---

**2.** 18 U.S.C. § 4241(d).

**3.** In response to the Court's edict, by letter dated July 20, 1993, Butner believed an additional ninety (90) days was a reasonable period of time.

**4.** After a hearing on December 2, 1992, the defendant was involuntarily medicated with antipsychotic drugs. Prolixin and Cogentin were first administered on December 7, 1992. Inderal was added on December 29, 1992. On February 2, 1993, all medication (Prolixin, Cogentin and Inderal) was stopped because the defendant did not appear to be getting better. A medium potency antipsychotic drug, Navane, was then administered. In July 1993, the treatment was changed to Haldol Deconate, a high potency antipsychotic medication. *Dr. Bryon Herbel's Deposition Transcript* at 20–21.

However, defense counsel favored deposing the doctors from Butner. Without objection by the United States, the motion was granted. On October 15, 1993, the depositions were conducted at Butner by Assistant United States Attorney, Victoria Major, and by counsel for the defendant, David White.

On November 18, 1993, after reviewing the deposition transcripts of Dr. Bryon Herbel, the primary therapist on the defendant's treatment team, and Dr. Rushton A. Backer, the secondary therapist, the Court again attempted to finally resolve the competency issue. However, after a lengthy hearing the court determined that the depositions were inconclusive and not very helpful because it was unclear whether the defendant's competency was restored as a result of the antipsychotic drugs and whether he would be competent to stand trial without the benefit of the drugs. Even after being deposed, the doctors did not resolve this issue with absolute certainty. The defendant, through his counsel, maintained that he is incompetent.

Thus, it became necessary, for the benefit of all parties, to have the defendant evaluated beginning with a clean slate. Therefore, the Court Ordered the defendant once again committed to the custody of the Attorney General, this time to FMC, Rochester, Minnesota, (Rochester) for an evaluation. Furthermore, the Court directed that Rochester not have access to any medical records or test results compiled during the defendant's stay at Butner and that the defendant be evaluated without any anti-psychotic drugs. That study was completed on or about December 30, 1993.

On January 28, 1994, after receiving the report from Rochester, the Court conducted another competency hearing. Dr. Mary A. Conroy, Ph.D., Director of Forensics at Rochester, concluded that the defendant was incompetent:

> Michael Kokoski currently suffers from a mental disease or defect which renders him unable to understand the nature and consequences of the proceedings against him or to assist properly in his own defense.

*Forensic Evaluation dated December 30, 1993* at 8.

However, this time the United States objected to the conclusion and argued that because Dr. Conroy did not rule out malingering [5], it could not accept the conclusion. This challenge by the United States was accompanied by a request for a review by a malingering expert of the raw data accumulated at Butner and Rochester. The final report from Butner concluded that the defendant was malingering. Although not held with the same convictions as Butner, the report from Rochester also indicated and did not positively rule out the possibility of feigning. The United States represented that it had located an expert in the field of malingering and requested that this expert be allowed to examine the raw data and reports concerning the defendant for the purpose of determining whether it would be beneficial to pursue the findings by Butner of malingering and the suspicions of malingering raised by Rochester.

The defendant, through counsel, objected to any further competency reviews and argued that the United States was simply unhappy with Dr. Conroy's determination of incompetency and is attempting to prolong the issue until it gets the result it wants—competency. Essentially, defendant's counsel was satisfied with the evaluation conducted at Rochester, and moved for dismissal of the charges against the defendant. However, the United States' motion was granted with the understanding that the defendant may also hire an expert of his choosing. Accordingly, the United States enlisted the services of Dr. Richard Rogers, Ph.D.. While there is no explanation in the record, apparently, the defendant chose not to engage the services of such an expert.[6]

---

5. *Forensic Evaluation dated December 30, 1993* at 7.

6. The defendant alleged that he was indigent and could not afford to hire an expert. However, he was advised that he may hire a malingering expert. Moreover, the Court found that the defendant did not have the financial ability to reimburse the Criminal Justice Act Fund for the attorney's fee and expenses incurred by Mr. Patterson. The fact that the defendant, upon his motion, was committed to a federal institution for

After a paper review, personal testing and evaluation of the defendant, Dr. Rogers filed his report on March 23, 1994 which concluded that the defendant was malingering.

At that time, there were three (3) doctors who concluded that the defendant was malingering and one doctor who held suspicions of malingering. Given these conflicting opinions, a competency hearing was held on March 30, 1994. That hearing commenced at 9:00 a.m. and concluded at approximately 4:45 p.m.

At the March 30th hearing, the following medical personnel appeared and testified pursuant to subpoenas issued by the United States:

Dr. Bryon Herbel, M.D., Staff Psychiatrist, FCI, Butner;

Dr. Rushton A. Backer, Ph.D., Staff Psychologist, FCI, Butner;

Dr. Mary Alice Conroy, Ph.D., Director of Forensics, Diplomate in Forensic Psychology, American Board of Professional Psychology, FMC, Minnesota; and

Dr. Richard Rogers, Ph.D., Director of Clinical Psychology, University of North Texas.

All of these doctors were subjected to cross examination by the defendant's counsel and, albeit limited, they were also questioned by the Court. At the conclusion of the testimony, the parties agreed to dispense with oral arguments in favor of legal memoranda. The transcript of the March 30, 1994 hearing was completed and made available to counsel on April 8, 1994. Counsel filed legal memoranda in support of their respective position on April 19, 1994.[7]

## LEGAL STANDARD

■■ The United States bears the burden of proving that the defendant is competent to stand trial.

In *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) the Supreme Court said that it is not enough for the district judge to find that the defendant is oriented to time and place and has some

recollection of events, but that the test must be:

[W]hether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational and factual understanding of the proceedings against him.

*Id.*

## DISCUSSION

The defendant's claim that he lacks the mental competency to stand trial is founded in his belief that he has special knowledge about a conspiracy involving Adolph Hitler and the Nazi government; that Hitler had been cloned and was trying to take over the world; that he is a prophet of God and is on a special mission from God; that he has special powers; that God talks to him and gives him special messages; and that he was arrested in an attempt to suppress his knowledge about the conspiracy.

In the clinical interviews conducted by these doctors, the defendant echoed his belief about the conspiracy, etc.

The Court begins its review with the testimony of Dr. Herbel and Dr. Backer, members of the treatment team from Butner, who had the opportunity to evaluate and treat the defendant at length.

### Dr. Herbel

Dr. Herbel testified that the defendant did have a psychotic disorder but it did not really fit into the other categories such as schizophrenia. On direct examination by the United States, the following questions and answers were developed:

Q. And, moreover, his conclusion that that, in fact, suggests some sort of religious paradigm again is not necessarily evidence of a mental illness, now is it?

A. That's correct, it would not necessarily be that. However, again, and this was the issue facing the treatment team, part of the reason we struggled so long over, are his reported symptoms genuine; are they completely faked to avoid the con-

---

evaluation at no cost to the defendant is ample evidence supporting indigency.

7. All parties have had equal access to each and every report or document filed in this case.

sequences for his alleged actions; or is there an in-betweenness in that there are some genuine parts of the illness present but he's also exaggerating and malingering.

And my position is that I believe that he's doing both; that he does have some components of a mental illness but that he also, you know, is on the ball enough, had it together enough to know that if he looks crazy enough, he's not going to have to go to court and he will avoid a potentially long sentence for his charge.

Q. Why is it in your conclusion, or was it your conclusion that having these religious ideations impairs his competence to stand trial?

A. Well, my conclusion, my conclusions were that he continued to express these ideas, but that it wasn't clear to me whether he was—let me go back to my final report.

And on Page 12, I say, "Based on his functioning in the Competency Restoration Group, it appears that he has an understanding of the nature of the proceedings of the courtroom. While he continues to describe beliefs that he has special knowledge of a conspiracy headed by Adolph Hitler clones, the forensic team no longer views these as psychotic delusions that keep him from working with his attorney. Rather, these ideas are seen as exaggerations of his idiosyncratic religious beliefs that do not interfere with his understanding of the court process or his ability to work with his attorney to assist in his defense if he so chooses."

Q. If, in fact, that was what was holding up your decision he was competent, that is unaffected, is it not, by whether he's on medication or is not on medication?

A. Can you repeat the question, please.

Q. Certainly. You indicated that throughout the treatment, this bizarre religious ideation was something that you all believed impaired his competence to understand and appreciate the proceedings.

A. Yes.

Q. You also conclude in your final report that while he continues to hold these, you no longer believe it interferes with his ability to stand trial.

A. That's correct.

*March 30, 1994 Transcript* at 49–51.

When questioned by defense counsel as to the sincerity of these beliefs, Dr. Herbel responded:

A. He does hold these beliefs. It's not clear to me with what conviction he holds the beliefs. And my conclusions in September of '93 that he did not hold these beliefs with sufficient conviction would put them in the category of delusions.

Q. Okay. And, of course, at that time, he was being administered the Haldol?

A. That's correct.

When questioned by the Court, Dr. Herbel testified:

Q. In response to a question from Mr. White, he asked you if your diagnosis was that Mr. Kokoski had both, was, there was a diagnosis both of mental illness and malingering.

A. Yes.

Q. Okay. Could you elaborate on that for me as it relates to the issue of competency.

A. Okay. My opinion about Mr. Kokoski is he is a, suffers from some degree of a delusional or a psychotic illness which is manifested by primarily the conditions with which he, I believe, at one time held these religious beliefs. It is possible that I was wrong and that he sort of faked me off in the very beginning.

But my opinion to the Court would be that he has some degree of a mental illness, a psychotic disorder. However, that mental illness never, did not affect him the way that you would have expected it to affect him and was never very pervasive.

In other words, even while sitting in jail prior to coming to Butner, he wrote letters which indicated he understood the plea agreement being offered to him. At our institution, as we have spoken, he did not manifest the kind of symptoms

that you would expect of somebody who was truly paranoid.... I was reluctant to state from the very beginning that all of this was not mentally ill, but he was also sort of being, it was being feigned.... He has a significant degree of malingering or exaggerating these symptoms. But it's not clear to me what the percentage is, how much of what he talks about is from deliberate attempt to play the game to avoid returning to court, and how much of it is due to the fact that his thinking is disorganized, that he has some elements of paranoid thinking.

So, my opinion to the Court, respectfully, is that there is both, and that was my justification for medication and I felt that part of his picture that was stemming from the mental illness was adequately treated with the medication.... Without medication he would be at risk of unraveling to some degree.

*March 30, 1994 Transcript* at 77–80.

Dr. Herbel's conclusion that the defendant was malingering was supported, in part, by Dr. Herbel's observations, and others who were involved in the evaluating process, of the defendant's socializing with "normal" as opposed to "abnormal" people. There is ample evidence in the record that this defendant was anything but a reclusive individual.

During his commitment at Butner, the defendant was given a series of psychological tests administered by Dr. Backer. However, under the DSM–III–R classification system, the Axis II diagnosis was not performed. Dr. Herbel testified that if the Axis II diagnosis had been done, the issue of malingering would have been brought out earlier in the evaluation process. Furthermore, he admitted that failure to administer the Axis II was an oversight. An Axis II diagnosis is used to determine personality disorders. *March 30, 1994 Transcript* at 60, 139.

**Dr. Backer**

Dr. Backer testified that he spent two and one-half hours testing the defendant, one-on-one. The remainder of the tests were administered by an intern. The tests administered to the defendant were: (1) the Minnesota Multiphasic Personality Inventory (MMPI), a self-administered test given to the defendant in seclusion; (2) the Rorschach Test, a projective test, personality test, administered one-on-one by Dr. Backer; (3) the Shipley Institute of Living Scale, yields an estimated level of intellectual functioning, taken by the defendant outside Dr. Backer's office; (4) the Bender–Gestalt test; (5) the Wechsler Adult Intelligence Scale (WAIS–R), the standard IQ test; (6) the Wechsler Memory Scale–Revised; and (7) the Trail Making Test, a screening device for possible organic problems.

Dr. Backer testified that the results of the MMPI test were extremely elevated, to a degree higher than is typically found with people who are psychotic. Therefore, Dr. Backer interpreted the first MMPI as consistent with a person who was psychotic: "Even though this could be a malingering profile, I think he's really psychotic and that's the interpretation I will give the test." *March 30, 1994 Transcript* at 94. Dr. Backer went on to describe the Rorschach, or better known as the "ink blot" test. The examiner shows ten cards—ink folded over—and asks what the card looks like and then goes through the same process again trying to get more information. Based upon the information, an examiner arrives at a hypotheses about an individual's personality. In assessing the results of the ink blot test, Dr. Backer felt strongly, at the time, that the defendant was psychotic. Dr. Backer testified that the defendant "seemed to really get into the test." *March 30, 1994 Transcript* at 95. "There were a couple of unusual things. He—I think it was on the second card, he thought it was moving. He thought the card was actually moving, which is very unusual ... it was just kind of like a visual hallucination or, or illusion. And that's very unusual." Dr. Backer thought this might have been caused by "residual aftereffect from just too many years of using hard drugs." *March 30, 1994 Transcript* at 96.

The Exner System for scoring the Rorschach has a schizophrenia index to look at variables. A certain number of positives are suggestive of a person with "psychotic, personally schizophrenic, schizophrenia being a specific diagnosis on a psychotic category."

Therefore, based on the clinical interactions with the defendant and the resulting profile, Dr. Backer initially believed that the defendant had a psychotic profile. *March 30, 1994 Transcript at 97.* However, after a forensic team meeting with the defendant, "it became pretty clear to me, and I think most everybody else, that he was not being honest with us; that he was trying to claim to be much more disturbed than he'd been in the past.... We felt he wasn't being straight with us. So, I decided I would readminister the Rorschach and the MMPI. And the results to me were that he produced a fairly, a much improved Rorschach protocol. It was nowhere near as disturbed as the first one. However, he, the MMPI was even more disturbed then the first one. And, as a matter of fact, the only way to interpret it is that it was malingering. It is so extreme.... I think there's a possibility that he was malingering or exaggerating things during that first Rorschach.... Since that time, and, again, during the time period towards the end of the last report, I had serious doubts as to whether he had ever been straight with us." *March 30, 1994 Transcript at 102–103.*

Dr. Backer admitted that he was so impressed that his view was swayed.

In conclusion, however, Dr. Backer testified:

Again, I think I was just so impressed with his performance on the Rorschach that I probably would have said, "Yeah, he's antisocial but I still think he's psychotic." But, like I said, given all the other indications subsequently that I think he's malingering, it certainly fits for me with the antisocial features that that's more consistent with what we were seeing as a person who is not all that really mentally ill but is somebody who has engaged in a criminal activity and it is sort of a convenient—my interpretation—a real convenient story to excuse away his criminal behavior.

*March 30, 1994 Transcript at 125.*

Under cross-examination, Dr. Backer testified:

Q. Okay. And it's your testimony further to the Court today that based on all of the materials and tests results and team meetings and all that sort of thing, you still believe that you could make an Axis II diagnosis today of a personality disorder; is that correct?

A. Yes, if not a full diagnosis, at least the features.

Q. Right. So that as we sit here today, it's your testimony to the Court that notwithstanding the malingering that you now apparently want to attribute to Mr. Kokoski, you can still make an Axis II diagnosis of personality disorder; is that right?

A. I think so.

Q. And that's your opinion?

A. Yes.

Q. And you have no difficulty doing it with the materials you have?

A. Correct.

Q. Do you have the Rorschach cards with you today?

A. I don't.

Q. Is it your testimony to the Court today that somebody would be bright enough to be able to fake the results of Rorschach by giving responses which would indicate a psychosis when, in fact, there was not one?

A. Yes, it's possible.

*March 30, 1994 Transcript at 134.*

In response to questioning by the Court, Dr. Backer admitted that some mistakes were made by the staff in the testing and evaluation of the defendant, in particular the failure to administer the Axis II test. To the question of competency and the effect of the medication, Dr. Backer responded to the Court that he could not completely rule out some psychotic disorder, but he did not believe the defendant is schizophrenic. When asked by the Court how Dr. Backer's diagnosis relates to the issue of competency, Dr. Backer replied:

A. Well, I'll give that to you in two answers, really, or two steps.

I'm convinced he was competent when he, when we rendered our final opinion. Again, the cloudy issue is that he was on medication.

In retrospect, looking back, I seriously question how incompetent he ever was. And I think that's because even at a time when objectively he should have been doing much better, he still was sometimes doing a bad job of it, claiming to not know things that we knew he clearly knew.

So that leads me to question how mentally ill he ever was because if it were just an issue of a mental illness, then that stuff should have cleared up. And, in our opinion, it did but he still maintained that he, you know, in my opinion, he was actively attempting to present himself as not competent.

Q. So, are you saying, if I understand you correctly, that in your opinion he was competent then and now with or without medication?

A. Well, the only problem I have with saying "now" is technically I should evaluate him now.

Q. Well, based upon you opinion now of all the information you previously had.

A. Yes. I think, looking back at everything, I think he was probably competent way back when we had him and I think that I got fooled and I think that we all did. Now, I can't say with a hundred percent certainty, but that's my opinion. I think he was competent even before the medication.

Q. And he was competent with or without the medication?

A. Correct.

*March 30, 1994 Transcript* at 141–142.

### ROCHESTER/Dr. Conroy:

Dr. Conroy spent between three (3) and four (4) hours interviewing and administering psychological tests to the defendant during his thirty day commitment to Rochester. Dr. Conroy found the defendant to be incompetent to stand trial.

Dr. Conroy administered the Structured Interview of Reported Symptoms (SIRS) test to the defendant which took between thirty-five and forty minutes. The WAIS–R test was administered by Dr. Robyn Barksdale,

Post Doctoral Forensic Psychologist, and the MMPI test was administered by a practicing student. The MMPI is scored by computer. Dr. Conroy was assisted in her evaluation by Dr. Daniel Hicks, Staff Psychologist, who provided a general psychiatric evaluation and observed the defendant on a periodic basis and followed him for any treatment needs.

Dr. Conroy described the defendant's behavior as polite, and congenial; no bizarre posturing or maneuvering; did not present as being confused or disorganized in his thinking; and complaints of auditory hallucinations. However, Dr. Conroy observed no evidence of these described hallucinations. Primarily, he presented ideations which appeared delusional. These ideations regarded a conspiracy, particularly a conspiracy which he believed would lead to Hitler and the Nazis taking over the world … that he was a special prophet of God with special powers and that God talked to him and gave him special messages. However, Dr. Conroy testified that the defendant said he had never used his special powers. *March 30, 1994 Transcript* at 159, 160.

According to Dr. Conroy, the MMPI administered to the defendant at Rochester proved to be invalid and uninterpretable from a psychological point of view. But, that does not mean it does not measure that which it is designed to measure. It could mean a number of things. For example, it could mean that he is totally disorganized, confused and disoriented. However, because the defendant's behavior was not bad, Dr. Conroy ruled out that hypothesis. It could also mean a cry for help or, deliberate exaggeration, which was Dr. Conroy's first hypothesis. In consideration of the MMPI profile, Dr. Conroy proceeded with the SIRS test which is specifically designed to catch feigning and exaggeration of symptoms. The SIRS also picks out people who exaggerate symptoms in a number of different ways by comparing the test taker's results with a normative population to ascertain whether the taker is, in fact, malingering.[8] The SIRS revealed that the defendant was exaggerating to some degree on the rare and blatant

---

8. The SIRS test was created by Dr. Richard Rogers.

symptoms. Rare symptoms are symptoms that most psychiatric patients do not report. An example given by Dr. Conroy of rare symptoms is "Does the furniture in your room frequently change its shape and color?" A blatant symptom is one that a normal person would think was a symptom of mental illness, if reported. However, it is not reported very often in a mentally ill population.

There were two other areas on the SIRS that the defendant scored zero which means no response and is indicative of feigning. However, Dr. Conroy could not recall those specific areas of the test. *March 30, 1994 Transcript* at 163–170.

The Wechsler Intelligence Test scored the defendant's IQ at 74, which is a borderline intellectual score.[9] The two subscales which he scored low were particular measures of concentration and distraction. Because he doesn't concentrate well, his IQ might have been slightly underestimated. Dr. Conroy explained that the two scores of concentration have to do with short-term memory, like digits backwards and forwards. Those two parts of the test are known as the digit span and digit symbol, both of which involve very short-term memory of numbers and symbols. However, there is no particular scale in the Wechsler that detects feigning, but it is possible to fake a digit recognition test by simply responding "I don't know." *March 30, 1994 Transcript* at 172–175.

Dr. Conroy testified that the defendant was able to remember, from time to time, issues relative to legal proceedings and general information without a problem.

Dr. Conroy applied the "preponderance of the evidence" standard in making her deduction of incompetence—"the preponderance of the evidence that I had went in that direction." *March 30, 1994 Transcript* at 177.

However, Dr. Conroy acknowledged that she approached that conclusion with two competing hypotheses—one of genuine mental illness and one of malingering and the strongest evidence in favor of malingering is the psychological test data. *Id.*

With regard to malingering, Dr. Conroy explained:

> I think the surprising thing to me about that was there was an inconsistency in that in that [sic] given the tremendous elevations I saw in the MMPI, I was fully expecting, which is why I administered it, and I haven't used this test for about two years now, I was expecting the SIRS to be highly elevated on a number of scales. And, instead, it was slightly elevated on two. But, nonetheless, that strongly goes in the direction of possible malingering.
>
> Mr. Kokoski's affect also was very related. He made eye contact. And very often, as I said in my report, often psychotic people do not do that. Mr. Kokoski does that.
>
> There is no evidence that he was confused or disoriented or disorganized in his thinking. Granted, he gave me what appeared to be delusional ideas, but they were always presented in a well organized and logical manner; in fact, almost amazingly so. So, those went in the direction of possible malingering.

*March 30, 1994 Transcript* at 178.

When questioned by the Court, Dr. Conroy responded:

> Q. How did you rule out, apparently, positively in your opinion exaggerations of mental illness symptoms?
>
> A. I didn't rule it out positively in any way. It's simply a matter of, in my opinion, from the data that I had and had access to the preponderance of the evidence, the majority goes in the face of genuine mental illness. Did I rule out malingering? No.

*March 30, 1994 Transcript* at 188.

### MALINGERING EXPERT/Dr. Rogers:

The final witness was Dr. Richard Rogers, the United States' "malingering expert." Prior to his personal evaluation of the defendant, Dr. Rogers conducted what was de-

---

9. A score below 70 is mildly mentally retarded; 70 to 80 is borderline; 80 to 90 is low average; 90 to 110 is average; 110 to 120 is high average; 120 is superior; and above 140 is considered genius. *March 30, 1994 Transcript* at 172, 173. Later in the hearing, Dr. Rogers testified that the defendant's IQ from the test administered at Butner was 84 (low average).

scribed as a "paper review." [10] The purpose of the "paper review" was to determine whether the defendant had a bona fide mental illness or was malingering. However, Dr. Rogers was unable to make that determination from his "paper review." Therefore, on March 17, 1994, Dr. Rogers conducted a personal interview and evaluation of the defendant. He spent approximately seven (7) hours with the defendant. That time was divided into two categories—one and a half hours for structured interviews and five and one half hours evaluating the defendant via tests and other standardized measures including the structured interview.

During Dr. Rogers evaluation of the defendant, the defendant reported the same beliefs about the Hitler conspiracy. He also reported having prominent auditory hallucinations that occurred on a daily basis for years but could not remember when these hallucinations began. These hallucinations were of God and the devil. He would hear them bilaterally through both ears and they would sometimes carry on arguments in his head. However, the defendant was not able to describe in detail anything with relationship to God speaking to him and he said that the devil yelled at him. Dr. Rogers testified that when persons experience these types of hallucinations, they are almost invariably able to describe how it was being said, the content of what was being said, whether it was spoken with or without an accent, and the tonal qualities. The defendant's description of his visual hallucination was that he saw Jesus within the sunset momentarily.

Dr. Rogers' conclusion was:

It seems to be very clear that Mr. Kokoski is feigning his, much of his psychopathology, much of his psychotic symptoms. It also seems very clear to me that he is also faking or feigning memory deficits in terms of not being able to remember things even in a short-term fashion.

*March 30, 1994 Transcript,* at 233.

The United States then inquired about the interaction of feigning and any bona fide mental illness and Dr. Rogers responded:

**10.** The paper consisted of the correctional records from FCI, Butner and FMC, Rochester; raw

The difficulty, of course, is when we have such clear evidence of feigning, it makes it very difficult to establish whether or not there is truly a bona fide disorder. As I pointed out earlier, one is not mutually exclusive of the other. So, it is possible that there could be, a, an Axis I or Axis II disorder coexisting with the malingering.... It seemed to me that the psychotic symptoms that were being presented by him were likely to have been feigned and certainly were likely to have been feigned as related to his competency to stand trial.

Q. If you assume, then, that the psychotic symptoms are feigned, what does that leave you with about the profile of Mr. Kokoski?

A. Well, it seems to me that the most likely explanation is that the reported impairment is also feigned, a purported impairment relative to competency to stand trial is also feigned.

Q. Do you have any opinion about what kind of mental disease or defect Mr. Kokoski may be suffering from coincident to any malingering?

A. Well, the possible diagnosis, and I'm being very clear to call them possible because I don't think we have adequate data at all to even suggest that they're probably a diagnosis, would be a delusional disorder, grandiose type, or schizophrenic disorder, paranoid type.

Q. Do you believe his delusional disorder, if it is bona fide, is significant enough to impair his ability to stand trial?

A. No, I do not.

*March 30, 1994 Transcript* at 234–235.

Dr. Rogers testified that when he questioned the defendant concerning the drug charges pending against the defendant, the defendant denied that there were drug charges pending. This is contrary to information he provided to the staff at Butner and Rochester.

test data on the MMPI and other measures.

Dr. Rogers believed that the reported delusions were inconsistent

If he held for as many years as he reportedly did hold the delusion that the Government was trying to kill him, then when I suggested to him in a relatively casual fashion that, indeed, he did not appear to be posing much of a threat to the Government as he was sitting there in jail, he readily changed his view of this and said, "Well, they may be trying to kill me at some time in the future." Someone who had such an apparently firmly held belief would unlikely be so ready to give that up. I was also—certainly, if he had these persecutory delusions, his ability to relate to me and to the correctional officers seemed exceptional, to say the least. I would expect him to be somewhat guarded and suspicious with me in his approach, and he was very forthcoming.

Likewise, with respect to his delusions, he stated that it would be the devil's work to engage in any kind of promiscuous act and expressed at one point distaste or displeasure about this.

And then several hours later in terms of the evaluation, he talked not only about engaging in casual sexual relations, but in a very laughing way as if this were something that he and I might kid about. And I find not the fact that he engaged in sexual behavior but his attitude towards that as inconsistent for someone who had firmly-held beliefs that this was improper and was the work of the devil.

Lastly, it just seems to me unlikely that he would hold the belief that he was living, as expressed at one time, with considerable fear that the Government was attempting to kill him and then later express the belief that he could not be physically killed. I just find that inconsistent.

Because of that, it seems to me we don't have complete evidence in terms of psychotic symptoms, certainly, that there is enough evidence to suggest that these, most of this, much of the more dramatic material is fabricated and, therefore, that he is likely to be competent to stand trial.

*March 30, 1994 Transcript* at 236–37.

On cross examination Dr. Rogers testified that given the ten point variance in the defendant's IQ score (74 and 84) his IQ "is probably someplace in that range." Dr. Rogers conceded that what we have is a range in terms of intellectual ability, but not a specific score and that his IQ could be lower than 74 and higher than 84. *Id.*, at 251.

The defendant was also given the Georgia Court Competency Test. Dr. Rogers testified that "[t]he impairment that he was importing on would clearly be incompetent.... It reflects that he is presenting as incompetent to stand trial except for the responses on those screening measures to screen for possible feigning.... There's been only one substantial study done of this. And in terms of that study, his scores would be at the very upper ranges of incompetency and more likely be associated with feigning. But, again, this is only one study which has been done and I think that should be treated as preliminary information." *March 30, 1994 Transcript* at 252–254.

When questioned about competency while on medication, Dr. Rogers responded

When I evaluated Mr. Kokoski, he was off medication for a substantial period of time and, so, at this point, it seemed to me that he is competent without medication.

*March 30, 1994 Transcript* at 260.

### ARGUMENT

#### United States

The United States' memorandum was concentrated primarily on the testimony offered at the March 30, 1994 hearing which was based upon psychological and psychiatric data.

In addition to the testimony, the United States cited specific remarks made by the defendant in his letters to the court, to Assistant United States Attorney Victoria Major, and to a third party. These remarks concerned the defendant's need for competent counsel, the severity of his possible punishment, and his refusal to accept a plea bargain. The United States argues that these writings demonstrate the defendant's appreciation of the charges against him and the penalty he faces upon conviction.

The United States concludes that even considering the minor variations in their perspectives and conclusions, all of the defendant's evaluators share the following four (4) notable observations:

1. Defendant reports psychotic symptoms completely contradicted by his presentation to the evaluators and interaction with them and other persons;

2. Defendant's reported psychotic symptoms and delusions cannot be verified and have not been manifested in any objective way to the evaluators;

3. Defendant's psychological tests reveal varying degrees of malingering or exaggeration; and

4. No evaluator has ruled out the possibility that defendant is malingering.

"It cannot be imagined what clearer sign of competence exists than malingering. Malingering signifies both an appreciation of the gravity of the defendant's situation and a rational attempt to address it. As such, defendant's obvious malingering demonstrates, by a preponderance of the evidence, his competence to stand trial." *United States Memorandum On Competency Evidence Presented at March 30, 1994 Hearing,* at 21–22.

### Defendant

The defendant believes that the "unmistakable conclusion to be drawn from the testimony is that Mr. Kokoski, unfortunately, is not competent to stand trial." *Defendant's Memorandum Of Law On The Issue Of Competency To Stand Trial,* at 1.

The defendant's memorandum focuses considerable attention to the legal standard for competency. In that regard, defendant's counsel questions the reliability of Dr. Rogers' opinion:

Upon careful scrutiny, it is apparent that Rogers did not apply a correct legal standard in stating that the defendant is competent to stand trial, and thus his opinion is not worthy of much weight.

*Id.,* at 8.

Counsel for the defendant argues that Dr. Rogers' understanding of the test to determine competency to stand trial in federal court does not comport with the enunciation of the test as Dr. Rogers stated it in a published article and that Dr. Rogers' understanding and testimony fails to make the critical distinction between a "factual" and "rational" understanding of the proceedings. *Id.,* at 9.

Counsel also argues that Dr. Rogers' credibility is further undermined by his testimony concerning the results of all of the objective tests for competency in that Rogers never testified that the responses on the objective trial competency tests were faked or feigned. Rather, counsel says, he apparently simply chose to ignore those results. *Id.,* at 10.

Essentially, counsel for the defendant believes that Dr. Conroy "hit the nail precisely on the head" in terms of the defendant's ability to assist his counsel.... Dr. Conroy's testimony is persuasive.... Dr. Conroy explained that 'psychotic people who are delusional aren't logical.' She further explained that Mr. Kokoski's delusions have now managed to incorporate themselves into the legal process. *Id.,* at 15–17.

"The conclusion to be reached from a comparison of Dr. Conroy's testimony to the comments made by counsel some two years ago in asking this court to order a competency examination is an obvious one. In essence, Dr. Conroy agreed that the defendant wants to defend a fictional case and does not have the ability to cooperate in defense of the real one. He is thus not competent to stand trial under any test." *Id.,* at 19.

### CONCLUSION

 The Court has made a conscientious effort to provide each party ample opportunity to defend their respective position and has extended an abiding patience in this protracted competency issue. However, a quick resolution of the defendant's mental competency was not feasible given his calculated attempts to disguise his ability to understand the charges against him and to assist his counsel in his defense. This defendant's competency status has been under evaluation for approximately eighteen (18) months and after scrupulous consideration of all of the evidence, the Court finally resolves the dispute.

The Court has incorporated herein what it determines to be sufficient relevant testimony in consideration of the sheer volume of evidence brought before it in the past eighteen (18) months, including the legal memoranda filed on April 19, 1994.

It is important to distinguish the role of the doctors who testified at the March 30, 1994 hearing. Dr. Herbel and Dr. Backer were members of the Butner forensic team who participated in the initial competency study and evaluation as well as being part of the team who treated the defendant after re-commitment to determine whether he could be restored to competency. Dr. Conroy was part of the treatment team at Rochester where the defendant was committed for a study and evaluation without the benefit of antipsychotic drugs. These three (3) doctors provided the Court with an opinion regarding the defendant's competency to stand trial.

Dr. Rogers was a "malingering expert" hired by the United States to delve into the raw data amassed by Butner and Rochester to determine whether the defendant was malingering and to what extent, if any. However, he did offer his opinion that the defendant was competent.

Although there have been conflicting, as well as inconclusive opinions filed in this case, there is one common thread that runs throughout these reports and/or conclusions—*malingering*, albeit to varying degrees.

Dr. Conroy was a very credible witness as so eloquently argued by defense counsel and she was not impeached. The only distinguishable difference between her testimony and her written report was that her reasoning was more defined in her testimony and she expounded on her suspicions of malingering. Obviously, she was deprived of recent information that she thought was critical to her assessment of the defendant and the absence of this information caused her to give less weight or credence to, but not positively rule out, her malingering hypothesis in favor of incompetency. It is noteworthy that during a thirty (30) day commitment to Rochester, Dr. Conroy was able to detect some degree of malingering.

The Butner team admitted that they were remiss in not making the Axis II diagnosis which would have brought out an earlier determination of malingering. However, in hindsight, Dr. Backer testified that he had no difficulty making an Axis II diagnosis of personality disorder with the materials he had now. Additionally, the Court feels compelled to give extra weight to Butner's conclusion that the defendant was competent and that he was malingering given that they were able to evaluate him at length—even though he fooled them for a long time.

The Court finds that Dr. Rogers' testimony and written report, both of which concluded that the defendant was malingering, were supported by the tests he administered, his personal evaluation and the raw data he reviewed from Butner and Rochester.

Although a medical definition of the defendant's mental impairment is missing, due partly to his ability to feign the evaluation, the Court does not believe that he has psychotic delusions that prevent him from assisting his attorney in his defense. The Court believes that the defendant's behavior is just a scheme devised by him to avoid going to trial or accepting responsibility for his conduct. He attempts to manifest his incompetency through the presentation of his idiosyncratic religious beliefs. However, these beliefs do not interfere with his understanding of the court process or his ability to assist his attorney in his defense.

The evidence in the record of this case, taken as a whole, supports a finding of competence. The Court also believes that the record sufficiently supports competency without medication.

Thus, the Court finds by a preponderance of the evidence that the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him. *Dusky, supra.*

■ Even though he has the present capability to assist his attorney, the possibility exists that he might just refuse. Nonetheless, such a refusal, or choice, does not imply

that he is incompetent and/or without the ability to assist his attorney.

Accordingly, the case is hereby set for trial on June 7, 1994 at 9:30 a.m. and a pretrial motions hearing is scheduled for May 12, 1994 at 10:30 a.m.

The Clerk is directed to mail a copy of this Order to the defendant, counsel of record, the United States Marshal for the Southern District of West Virginia, and the Probation Department of this Court.

IT IS SO ORDERED.