**UNITED STATES of America,**
**Plaintiff,**

v.

**Kyle Ray DeCOTEAU, Defendant.**

**Case No. 4:08–cr–037.**

United States District Court,
D. North Dakota,
Northwestern Division.

Sept. 1, 2009.

David D. Hagler, U.S. Attorney's Office, Bismarck, ND, for Plaintiff.

William Delaney Schmidt, Federal Public Defender Office, Bismarck, ND, for Defendant.

## ORDER

DANIEL L. HOVLAND, Chief Judge.

### I. *BACKGROUND*

This matter comes before the Court as a result of the Order for Competency Evaluation filed on April 17, 2009. *See* Docket No. 49. Thereafter, the Defendant underwent an evaluation at the North Dakota State Hospital in Jamestown, North Dakota.

On June 12, 2009, the Competency Evaluation of Dr. Robert D. Lisota was issued. *See* Exhibit No. 2. Copies of the evaluation were immediately sent to counsel. Dr. Lisota issued a detailed report and evaluation and opined that the defendant, Kyle Ray DeCoteau, was competent to stand trial. A competency hearing was held on August 26, 2009, in Bismarck, North Dakota.

## II. FACTS

The defendant, Kyle Ray DeCoteau, was evaluated at the North Dakota State Hospital in Jamestown, North Dakota, on June 9, 2009. During his time at the facility, DeCoteau was observed by staff and was seen by Dr. Lisota, a forensic psychologist. DeCoteau took part in a lengthy clinical interview on June 9, 2009, and was administered a series of psychological tests and assessments consisting of the Kaufman Brief Intelligence Test, Second Edition (KBIT–2), the Competence Assessment for Standing Trial for Defendants with Mental Retardation (CAST*MR), and the Revised Competency Assessment Instrument (R–CAI). The results of the tests and assessments are set forth in detail below:

*Kaufman Brief Intelligence Test, Second Edition (KBIT–2):*

Mr. Decoteau received an IQ Composite score (mean =100, standard deviation =15 points) of 55, placing him in the "lower extreme" with regard to the KBIT–2 normative sample. There is a statistically significant (p < .01) Verbal (69) vs. Nonverbal (52) difference, which indicates that Mr. Decoteau is likely to present as higher functioning than he actually is. The results of the KBIT–2 are consistent with previous testing which places him in the Mild Mental Retardation range with respect to cognitive function.

*Competence Assessment for Standing Trial for Defendants with Mental Retardation (CAST*MR):*

The CAST*MR is unique with regard to standardized competency assessment instruments in that it is designed specifically to assess individuals who have varying degrees of cognitive impairment. Mr. Decoteau received a score of 18/25 on the Basic Legal Concepts section of the test, the mean or average score of individuals who were mentally-retarded (MR) and found competent to stand trial

was 18.3, the mean score of MR individuals who were not found competent was 12.3. In a similar manner, Mr. Decoteau received a score of 14/15 in the Skills to Assist Defense portion of the test, the mean score for MR-competent individuals was 10.7. The final section of the CAST*MR was problematic in that Mr. Decoteau's version of events is radically different from that presented by the authorities. Two questions could not be answered by Mr. Decoteau without essentially incriminating himself, something he was careful not to do. As such, the third section standard scores cannot be reported. It is important to note, however, that of the eight questions he was able to answer, he received full credit which indicates that he has no significant difficulty with regard to understanding case events.

*Revised Competency Assessment Instrument (R–CAI):*

The R–CAI is not a standardized assessment instrument, nor was it developed specifically to address questions associated with competency in a population with significant cognitive deficits. Nevertheless, the instrument (structured interview) is quite useful in this case in terms of "testing the limits" and establishing exactly what Mr. Decoteau does and does not understand with regard to trial competency issues and how well he responds to remediation. When asked questions about the charge he was facing, Mr. Decoteau responded "rape" but knew the charge itself was worded differently. When asked what actions one would have to perform in order to be charged/convicted of such a crime, he was initially confused but responded well to a brief discussion on the topic. He understood that this was a very serious charge.

When asked what possible penalties he would face, he responded "30 years to

life." When asked how he could confirm this, he reiterated he could/would ask his attorney (federal sentencing guidelines examined by the undersigned indicate a sentence of approximately 20–25 years). He understood that if convicted he would have to serve his time in prison, and demonstrated a good understanding of probation and the associated conditions/penalties.

With regard to available legal defenses (pleas), he understood that he could enter a plea of "guilty" or "not guilty" and what those meant. He did not appear familiar with the concept of "Not Guilty by Reason of Insanity" (NGRI) but responded fairly well with some education. Nevertheless, his understanding of this particular plea is an area that would likely require a significant amount of remediation before he could fully understand the implications associated with such a plea. He felt that he could best be defended against the charge filed by being able to prove that he was at home when the alleged crime occurred, which is reasonable. He had a fairly good grasp of the role of defense counsel, the prosecutor, the jury, and the defendant. Roles which required remediation included that of the judge and witnesses, but Mr. Decoteau appeared to understand these concepts reasonably well after discussing them in detail.

In discussing his understanding of court procedures, Mr. Decoteau did not know whether or not defendants have to testify, but responded well to brief education on the topic. He understands that it is his own attorney that is the only person that can call on him to testify, that when testifying it is in his best interest to answer the questions asked, and that the prosecutor is trying to prove that he is guilty (and that if he testifies, he will have to answer questions posed by the prosecution). He did not understand the difference between a bench and jury trial initially, but quickly grasped this concept.

His motivation to help himself with regard to the potential outcome of a trial is quite high, he understands that at this time the court does have authority over him, the concept of evidence (but is unaware of what evidence the prosecution has) and feels good about his chances of being found not guilty. Mr. Decoteau understood the basic concept of a plea bargain, and responded well to brief education about rights that he would have to give up if he took a plea bargain. When asked what he would do if a plea bargain was offered, he stated that he would talk about it with his lawyer and follow his advice in the matter. When asked whether or not he would consider a plea of NGRI, he stated that he wasn't sure, but would do so if his lawyer felt that was the best way to proceed.

Mr. Decoteau was unable to provide his attorney's last name (his card is in Mr. Decoteau's wallet, which he did not have at the time of the evaluation) and knows him as "Bill". He reports meeting with his attorney in excess of 20 times, and has a very high degree of confidence in his attorney. He understands the concept of attorney-client confidentiality, states that he remembers everything that happened with regard to the time of the alleged offense, understands that his attorney can best defend him if Mr. Decoteau is completely honest and forthcoming with him and denies having any difficulty doing so.

He demonstrated a good awareness of appropriate court behavior and the potential consequences associated with misbehavior. Given his lack of legal history, his understanding of court proceedings and concepts relative to trial competency is actually much higher than expected. When asked about how he had obtained this knowledge, he stated

that he has learned a great deal about how the legal system works in the 14 months he has spent in a "half-way house." With regard to mental illness, Mr. Decoteau reported that his only problem was his "mental handicap" (mental retardation).

With respect to Dr. Lisota's opinions as to DeCoteau's competence to stand trial, the following was expressed:

Based on the results of the clinical interview and assessment instruments designed to address Mr. Decoteau's ability to understand the nature and consequences of the proceedings against him, or to assist properly in his defense, it is concluded that while Mr. Decoteau has very significant cognitive deficits, they do not rise to a level which would significantly compromise his ability with regard to the nature and consequences, nor pose a significant hindrance in his ability to assist in his defense. With regard to the last point, his high degree of confidence in, and reportedly very good relationship with his attorney make it likely that he will be cooperative and forthcoming, providing his attorney with the information necessary to plan an appropriate defense as well as deferring to his attorney when it comes to specific issues that may be difficult for Mr. Decoteau to grasp. As a result, after taking his cognitive deficits into account, it is the undersigned's professional opinion that Mr. Decoteau is indeed trial-competent.

The second question posed by the court was whether, at the time of the alleged offense, Mr. Decoteau suffered from a mental disease or defect. Reports indicate a pattern of inappropriate sexual behavior dating back to childhood. Despite reported treatment in a residential setting for approximately six months for sexually-deviant behavior, reports since that time indicate that he did not obtain the desired benefit from that treatment.

As Pedophilia is extremely unlikely to simply disappear without intensive sex offender treatment, it is concluded that at the time of the alleged offense(s) Mr. Decoteau was experiencing and presenting (if the allegations provided by authorities are proved correct) with symptomatology consistent with a Pedophilia diagnosis. In addition, at the time of the alleged offenses his cognitive functioning was impaired consistent with previous diagnoses, as there is no known treatment for Mental Retardation or any known means by which such a condition would change for the better.

Dr. Peter C. Peterson also testified at the competency hearing. Dr. Peterson is a clinical psychologist employed at Medcenter One in Bismarck, North Dakota. Dr. Peterson first saw DeCoteau on December 3, 2008, and conducted a psychological evaluation on that date after a lengthy interview. *See* Exhibit No. 6. Dr. Peterson reached the following conclusions from his evaluation:

IMPRESSION: It appears that this man is functioning in the mild range of mental retardation. This is corroborated by his academic achievement levels and his history of dependency upon others and level of social/educational development. He does not appear to be psychotic, brain injured, or suicidal or homicidal. He does present significant intellectual limitations which raise questions regarding his mental competence. He appears to be capable of cooperating with his attorney. He does not appear to understand his legal charges or the implications of his current legal difficulties. He does not understand the possible consequences of his legal proceedings.

On February 13, 2009, Dr. Peterson again saw DeCoteau. *See* Exhibit No. 7. The medical records reveal the following:

IMPRESSION: Based upon the above psychological survey, this man is functioning far below chronological age expectations in his communication skills and socialization skills. He shows relatively higher daily living skills. It is apparent, based upon his history and his intellectual functioning, that he is dependent upon external support. He is unlikely to be capable of functioning independently as an adult. The patient's psychological testing and collateral reports obtained today do confirm his relatively low level of intellectual functioning and general developmental maturity.

At the hearing, Dr. Peterson was questioned as to whether he considered DeCoteau competent to deal with legal matters. In response, Dr. Peterson stated that DeCoteau's IQ levels raise "serious questions" as to his ability to understand the entire legal process. Dr. Peterson further said he is "doubtful" that DeCoteau is capable of effectively assisting in his own defense.

## III. *LEGAL ANALYSIS*

■ It is well-established in the Eighth Circuit that there is a three-part scheme for determining mental competency to stand trial under 18 U.S.C. § 4241. *United States v. Ferro*, 321 F.3d 756, 760 (8th Cir.2003). The Court must first determine, by a preponderance of the evidence whether the defendant suffers from a "mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(d). In *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), the Supreme Court said that it is not enough for the district court to find that the defendant is oriented to time and place and has some recollection of events. Instead, the question before the Court is whether the defendant presently has a rational and factual understanding of the proceedings against him *and* the ability to consult with his lawyer with a reasonable degree of rational understanding. *See Drope v. Missouri*, 420 U.S. 162, 172, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975).

■ If the district court concludes that the defendant is competent, then the case proceeds to trial. However, if the district court concludes that the defendant lacks sufficient mental competency to proceed to trial, the Court is required to commit the defendant to the custody of the Attorney General pursuant to the provisions of 18 U.S.C. § 4241(d) in order to determine whether there is a sufficient probability that, in the foreseeable future, the defendant will attain the capacity to proceed to trial. If it becomes apparent that the defendant will not attain sufficient capacity to proceed to trial, a "dangerousness hearing" is then conducted pursuant to 18 U.S.C. § 4246 to determine if the defendant would pose a " 'substantial risk of bodily injury to another person or serious damage to property of another' upon release." *Ferro*, 321 F.3d at 761 (quoting 18 U.S.C. § 4246(a)).

■ Based on the file and the evidence presented at the competency hearing on August 26, 2009, the Court finds by a preponderance of the evidence that the defendant, Kyle DeCoteau, is mentally competent to stand trial and to participate in the judicial proceedings to determine the validity of the criminal charges filed against him. The Court further finds that the defendant, although undisputedly suffering from a mental disease or defect, is mentally competent and able to understand the nature and the consequences of the proceedings against him, and is able to properly assist in his defense. *See* 18 U.S.C. § 4241(d).

■ It is well-established that the Government bears the burden of proving the defendant is competent to stand trial. *See Brown v. Warden, Great Meadow Correctional Facility,* 682 F.2d 348, 349 (2d Cir. 1982) ("the burden is placed on the prosecution to prove that the defendant is mentally competent to stand trial"); *United States v. Hollis,* 569 F.2d 199, 205 (3d Cir.1977) ("no burden of proof rests on a defendant to demonstrate his own incompetency"); *United States v. Makris,* 535 F.2d 899, 906 (5th Cir.1976) ("There can be no question that in federal criminal cases the government has the burden of proving defendant competent to stand trial"); *United States v. Mason,* 935 F.Supp. 745, 759 (W.D.N.C.1996)("The burden of proof of competency is on the Government to prove competency by a preponderance of the evidence"); *United States v. Kokoski,* 865 F.Supp. 325, 329 (S.D.W.Va.1994) *aff'd* 82 F.3d 411 (4th Cir.1996) ("The United States bears the burden of proving that the defendant is competent to stand trial."); *United States v. Riggin,* 732 F.Supp. 958, 963 (S.D.Ind.1990) ("the burden of proving competence to stand trial would implicitly fall on the government"). The Government has met its burden in this case.

Both Dr. Robert Lisota and Dr. Peter Peterson's opinions were received in evidence without objection. Both psychologists are well-trained, competent, and capable professionals whose opinions are reasonable and straight-forward. Dr. Lisota is a trained forensic psychologist who conducted an extensive review of DeCoteau's records and utilized several forensic tests and assessments to formulate his opinions on competency. Dr. Peterson is an experienced clinical psychologist who has certainly raised serious questions concerning DeCoteau's level of functioning and, in part, his competence. The medical records, at times, reveal an individual (DeCoteau) whose appearance, presentation, and response to questions from psychologists is inconsistent with his low level of intelligence and functioning. Suffice it to say that the case is troublesome and complex. The Court expressly finds by a preponderance of the evidence that the defendant, Kyle DeCoteau, is competent to stand trial. The trial is presently scheduled to commence on Tuesday, November 17, 2009, in Bismarck, North Dakota.

**IT IS SO ORDERED.**