UNITED STATES of America

v.

Paul Eugene MASON.

No. 3:92CR159–01–P.

United States District Court,
W.D. North Carolina,
Charlotte Division.

June 25, 1996.

Robert J. Conrad, Jr., Charlotte, North Carolina, for plaintiff.

William McNaull, Jr., Charlotte, North Carolina, for defendant.

### *MEMORANDUM AND ORDER*

ROBERT D. POTTER, Senior District Judge.

### I. *BACKGROUND*

**THIS MATTER** is before the Court on remand from the Fourth Circuit Court of Appeals for a retrospective determination of the Defendant's competence during the first phase of his trial. The procedural history of this case is in *U.S. v. Mason,* 52 F.3d 1286 (4th Cir.1995).

The Fourth Circuit rendered its opinion on May 9, 1995. On May 18, 1995 the Government moved for Pretrial Psychiatric or Psychological Examination of Mason. The defense counsel responded on May 23, 1995 that the Defendant was at FMC, Rochester, Minnesota, diagnosed with an aneurysm of the aorta and that any mental examination not interfere with his medical treatment. The Court, on May 24, 1995, ordered the United States Attorney to provide the Court with a report by June 23, 1995 as to Defendant's physical condition and his ability to travel without endangering his life.

Mr. Mason was scheduled for surgery on October 18, 1995 with convalescence of three weeks. Mason was finally allowed to travel and admitted to Butner on January 4, 1996 for examination pursuant to the provisions of 18 U.S.C. §§ 4241(a) and 4241(b).

This Court on December 6, 1995, ordered a psychiatric evaluation of Defendant to assess

retrospectively his competency to stand trial in November 1992.

The forensic report from Butner was received March 6, 1996.

The United States Marshals Service was notified to return Mason to this District. On March 6, 1996, the Court ordered a competency hearing on April 3, 1996.

The FCI, Butner evaluated the Defendant. The Forensic Evaluation was conducted by Dr. Mark Hazelrigg, Ph.D., Clinical Psychologist (hereinafter "Hazelrigg") with psychiatric consultation provided by Jean Zula, M.D., Staff Psychiatrist. The evaluation states that other members of the Forensic Team, Correctional, and Mental Health Staff also had opportunity to observe Defendant's behavior throughout the course of the evaluation and in a forensic case review held on February 13, 1996. The report states that their comments were considered prior to the preparation of the report.

The forensic report prepared by Hazelrigg indicates that prior to 1992 the Defendant had no contact with mental health professionals.

The Court held a competency hearing on April 3, 1996[1] at which Hazelrigg testified that he was employed at the FCI, Butner, North Carolina, as a staff psychologist, the official staff position being a clinical psychologist. (Tr. pp. 9–10).[2]

## II. TESTIMONY AT COMPETENCY HEARING APRIL 3, 1996

### A. Direct Examination of Dr. Mark Hazelrigg by the Defendant.

Dr. Hazelrigg was called as a witness by the Defendant. Dr. Hazelrigg testified that this retrospective competency examination of Mr. Mason commenced January 5, 1996. (Tr. p. 10). He further testified that he had conducted retrospective evaluations many months or even years in the past and that retrospective examinations are not unusual and that a very common evaluation they do (at Butner) is the mental state of the defendant at the time of the offense which is always retrospective in nature. (Tr. p. 11). Hazelrigg further testified that he would not characterize the issue of competency as being more or less detailed or more or less difficult—that they both involve the same essential issues. (Tr. p. 11).

Hazelrigg further testified that he had spoken with Defense Attorney Vaughn and cites him several times in the report. (Tr. p. 12).

Hazelrigg testified he had spoken with Mason's sons Paul Mason by phone and Jeff Mason face to face. (Tr. p. 12).

Hazelrigg also testified that he had the written opinions in the form of a written report of Drs. Owens and Baker and did not feel it was necessary to speak with them. (Tr. pp. 13 & 14).

Hazelrigg was familiar with the report of Dr. Kevin J. McBride dated January 29, 1993, a clinical staff psychologist at Butner. (Tr. pp. 14, 15, 58, 59). Hazelrigg did not contact personally either Dr. McBride or Dr. Williams who were evaluating Mr. Mason at Butner in 1993. (Tr. p. 15).

It is hypothetical to say that it would have been of greater value to Hazelrigg in his report to have been able to have interviewed the Defendant in December 1992 and January 1993. (Tr. pp. 16, 17).

It would have been more valuable to assess the Defendant's mental state during the trial. (Tr. p. 17). An evaluation that was conducted or at least commenced some five weeks after his attempted suicide would have some value, as would an opinion rendered seven or eight weeks after Defendant's attempted suicide. (Tr. p. 17).

Dr. Hazelrigg discussed with a number of people the fact that Mason picked up his attorneys Vaughn and McNaull each morning and brought them to Court. (Tr. p. 19).

Hazelrigg did not recall specifically reviewing the psychiatric report from Carolinas Medical Center ("CMC"), but he does remember the CMC records as a whole after the Defendant's suicide attempt. (Tr. pp. 18, 20, 21).

---

1. The transcript of the hearing bears the date April 4, 1996. Actually it was April 3, 1996.

2. "Tr." refers to transcript of Competency Hearing before this Court on April 3, 1996.

748

Dr. Hazelrigg does not recall being told that the Defendant's former wife would like to speak with him. However, he was provided with written notes she had made. (Tr. p. 22).

Dr. Hazelrigg knows from the records that up to the time of trial Mason was in some way involved in his business, though he does not know the extent of his involvement. (Tr. p. 23).

Dr. Hazelrigg's report that Mason was "running his business" was based on Mason's characterization of what he was doing. (Tr. p. 24).

Dr. Hazelrigg found Mason's reports of his activities to be fairly accurate based on similar stories from other people. He did not find major inconsistencies in Mason's reports and other sources of information. (Tr. p. 25).

Dr. Hazelrigg did not review records from the Rochester Federal facility where Mason was located. (Tr. p. 25). Mason was not in the mental health facility at Rochester. He was there for a medical procedure. (Tr. p. 26).

One of the psychologists that saw Mason at Rochester was recently transferred to Butner and Hazelrigg recalled talking with him and he did not report anything untoward or unusual about the admission. (Tr. pp. 26, 27).

Mr. Mason was not at Rochester for a psychiatric evaluation, and that period of time was not relevant to the time Hazelrigg was evaluating. (Tr. p. 27).

Mr. Mason was at Rochester for the repair of an aortic aneurysm. (Tr. p. 28).

Dr. Hazelrigg conducted a Minnesota Multiphasic Personality Index ("MMPI") to help him understand the individual he was dealing with at the time. (Tr. p. 29).

Dr. Hazelrigg did not conduct any test that would have aided him in determining Mr. Mason's competency some thirty-nine months ago, since to his knowledge there are no such tests. In a retrospective evaluation of this sort information needs to be gathered from a variety of sources and sometimes in indirect ways. (Tr. p. 30).

Again, the analysis Hazelrigg administered to Mason was the MMPI, and he did that with the idea of trying to determine, or at least show some insight as to his condition at some time in the past because he had two other MMPI profiles that were done in the previous two evaluations, and by comparing those three evaluations he was hoping to be able to come to some conclusion about how stable or unstable his mental condition was. (Tr. p. 30).

The MMPI tests did not directly address the issue of competency. The three different profiles that were obtained, there were some consistencies, there were some differences over time so that there were some changes in his mental condition and some things that stayed relatively stable. (Tr. p. 31).

Even though the past personality assessments were variable, it was not subjective; it means that at one time Mason responded in one way and at a different time he responded differently. Each could be interpreted in an objective fashion. (Tr. p. 31).

Dr. Hazelrigg worked with Dr. Zula, a medical doctor, who concurred with Hazelrigg that Mason was competent in November 1992. (Tr. p. 32).

In evaluating Mason, Hazelrigg spoke with Defendant's attorneys McNaull and Vaughn, Jeff Mason, Defendant's son, and Ms. Shappert. He testified he also had transcripts in which the Court made comments relevant to his behavior during the trial.[3] (Tr. p. 34).

3. The Court has examined the entire trial transcript and the only comment by the Court is on page 679, lines 11–12, when the Court remarked "He tends to be late all the time." Again, the only thing the Court remembers is that Mason was usually hurrying down the courtroom aisle after the jury was summoned subsequent to a break. See Trial Tr. p. 503, lines 21–25; p. 504, lines 1–4, illustrating Defendant's arriving at same time as jury. This appears to be the only time the record reflects the Defendant's not being seated when court reconvened after a break although the Court seems to recall that occurred more than once. However, it was not serious enough to make an issue of it, as long as Mason was in the courtroom at the designated time for the Court to convene.

Dr. Hazelrigg attempted to obtain information from all the people available who observed the Defendant during the trial. He also had a written statement from the case agent, Mr. Wilhelm, in the form of a memo to Dr. McBride. (Tr. p. 35).

Dr. Hazelrigg did not review the transcripts of the trial because Mason did not testify. (Tr. p. 36).

In connection with preparing his report, Dr. Hazelrigg spoke with Mr. McNaull about twenty minutes and with Mr. Vaughn about the same amount of time. He took detailed notes of those conversations. He does not recall either of them stating there were a lot of things they could not remember after three years. (Tr. p. 37).

Dr. Hazelrigg spoke with Ms. Shappert twice in conversations which were briefer than those with Mr. McNaull and Mr. Vaughn. (Tr. pp. 37, 38).

Dr. Hazelrigg did not advise Ms. Shappert of his opinion. (Tr. p. 38).

Dr. Hazelrigg obtained a copy of the Fourth Circuit's opinion which stated there were affidavits *from Mason's attorneys* that were filed with the Court which stated that there was a medical doctor or a clinical psychologist that. felt Mason was not competent to stand trial. (Tr. pp. 39, 40).

The fact that these two doctors had given an opinion did not cause Hazelrigg to feel it necessary to speak with either of them further. He had the written record of their evaluations, all their progress notes and the opportunity to go to the primary sources and address the issue directly. (Tr. p. 40). Dr. McBride and Dr. Williams were not authorized to do an evaluation of Mr. Mason's competency at the time of trial. (Tr. p. 46).

The evaluation by those two doctors which Hazelrigg reviewed would not necessarily have suggested to Hazelrigg Mason's competency at trial anyway. It was not the intention of the evaluation by McBride and Williams in the first place. (Tr. pp. 40, 41).

Dr. Hazelrigg testified that in the course of the evaluation by Dr. Williams and Dr. McBride the question of Mason's competency was raised in their minds, and apparently they reported to Mr. McNaull and Mr. Vaughn, and apparently that was sufficient for the Court to determine that the issue should be addressed independently in a focused evaluation, which Hazelrigg was charged with doing. (Tr. p. 41).

Mr. Vaughn at this point completed his direct examination of Dr. Hazelrigg.

In a colloquy between Defendant's attorney Vaughn and AUSA Shappert the following transpired:

MS. SHAPPERT: Mr. Vaughn, at first I'd like for you to provide the records of FCI Manchester, Rochester, rather, if you have them.

MR. VAUGHN: No, I do not have them.

MS. SHAPPERT: So, the questions you have asked about two suicide attempts (see Tr. pp. 25, 26) you don't have any records to back up the questions you asked?

MR. VAUGHN: No, not at all. No, Your Honor.

MS. SHAPPERT: All right. Your Honor, I would also ask for copies of the Carolinas medical [sic] reports. In fact, do you have a basis for those questions about two suicide attempts?

MR. VAUGHN: No, only that I had read reports in which there were questions about Mr. Mason that—no.

MS. SHAPPERT: You don't have the reports, then?

MR. VAUGHN: No.

(Tr. p. 41, lines 24–25; p. 42, lines 1–16).

### B. *Cross–Examination of Dr. Hazelrigg by the Government.*

Dr. Hazelrigg identified the CMC report and stated that it was part of the medical records he had reviewed. (Tr. p. 42).

Dr. Hazelrigg testified that when Mason's counsel had asked him about the records he agreed that he had in fact considered the CMC records but did not recall the specific documents, but recognizes it as having reviewed it.

Dr. Hazelrigg further testified that in preparing his report for the Court it was his preference based on his training and experience to rely as much as possible on primary

sources of information, and that those primary sources included conversations with the Defendant's family and a review of the materials he previously referred to in his report. Based upon his training and experience in forensic psychology that is an accepted means of preparing a forensic report. (Tr. p. 43).

Dr. Hazelrigg consulted with his colleagues over this issue and both his supervisor and the administrator of the health unit recommended not speaking with other doctors, but coming to an independent decision. Only one person in the forensic unit recommended that he speak with Dr. McBride or Dr. Owens about the previous evaluations and his rationale was simply to avoid this line of questioning, so that he could say he covered all the bases, but he did not say there was any substantial bit of information he would have expected Hazelrigg to get from them. (Tr. pp. 43, 44).

Dr. McBride's and Dr. Owens' evaluation was more similar in that it was addressing competence to proceed with sentencing, which they found the Defendant competent to do. (Tr. p. 44).

When he was preparing his forensic evaluation, Hazelrigg had available additional material to what was available to Dr. Williams and Dr. McBride when they prepared their report in 1993. He did not disagree with the AUSA's statement that he had the affidavits from the attorneys, their conversations with the attorneys and the family members, the suicide note, the affidavit of David Wilhelm, the case agent, all indicating Mason was prompt for all judicial proceedings and conducted himself respectfully in the courtroom, remained seated at counsel table; his conversation with his defense attorneys was never above a whisper; Mason's conduct outside the courtroom was calm and composed with no displayed animosity toward case officials or witnesses; throughout the investigation Mr. Mason displayed consistently rational and coherent behavior with the exception of the suicide note. This memo was submitted to McBride also. In addition to the reports, Hazelrigg had copies of briefs submitted by the United States and portions of the transcript which reflected that the defense coun-

sel, at the time of the suicide attempt, gave varying representations to this Court about the Defendant being inclined toward suicide. (Tr. p. 46).

One of Defendant's attorneys told the Court that his client had been suicidal for months and the other attorney told the Court that he had no knowledge that his client was suicidal. (See Trial Transcript, p. 679, lines 24–25; p. 680, lines 1–2; p. 681, lines 21–23).

Dr. Hazelrigg further testified that nothing in anything Mr. Vaughn raised in his direct examination altered his report as to the competency of Paul Mason at the time of his trial in November 1992.

### C. *Redirect Examination of Dr. Hazelrigg by the Defendant.*

Dr. Hazelrigg testified that for the reasons he stated previously he did not speak with the psychiatrist or the psychologist at the Carolinas Medical Center, nor did he speak with any of the doctors or clinical psychologists at the Rochester facility. (Tr. p. 47).

*Defendant's son, Jeffrey Mason, is the only person that he could find throughout his notes that stated Mason was late on a consistent basis.* According to his reports, Mason did not report he was consistently late, neither did McNaull, Vaughn, or Shappert. (Tr. p. 48).

Dr. Hazelrigg stated that Jeff Mason was certainly invested in the best interest of his father. (Tr. p. 48).

Dr. Hazelrigg took his information and compared it with other sources of information which is what he does with all pieces of information which he receives. He does not try to establish whether or not it is true. (Tr. pp. 48–49).

### D. *Direct Examination of Jeffrey Raymond Mason by the Defendant.*

This witness was called by the Defendant. The witness is the youngest son of Paul Eugene Mason, the Defendant. He testified that he had talked with Dr. Kevin McBride at FCI Butner by telephone in late December 1992, early January 1993. He also spoke with Dr. Hazelrigg.

Jeffrey Mason testified that he has been misquoted about observing his father drinking during the trial. He did not say that he observed his father had been drinking during the trial. He learned his father had been drinking during the trial in a lengthy discussion he had with his father on Thursday, November 5 or the Thursday before the suicide attempt. (Tr. pp. 51, 52). His only conversations with Dr. Hazelrigg have been by telephone. (Tr. p. 52). Jeffrey Mason testified he spoke with Dr. McBride several times by telephone and that his discussions with Dr. McBride about family history were fairly lengthy. Jeffrey Mason testified that he had given McBride notes and cards that had suicidal ideations in them back in '92 and other dates.

### E. *Cross–Examination of Jeffrey Raymond Mason by the Government.*

Jeffrey Mason testified he was living and working in Boone, North Carolina, and attending Appalachian State University part of the years 1990 and 1991. (Tr. pp. 54–55).

In 1992, Jeffrey Mason was attending UNC. He was not in Charlotte when his father's business was searched by law enforcement in November 1990. He heard about it later. He testified that his father maintained an office at his place of business, Tape City. (Tr. p. 56). He testified that Dr. McBride's report is accurate and that he was aware that Dr. McBride's report was one of the items examined by Dr. Hazelrigg in preparing his report. (Tr. p. 57).

### F. *Direct Examination of Dr. Kevin McBride by Defendant.*

Dr. McBride was called as a witness by the Defendant. Dr. McBride's testimony was that he was a clinical psychologist at FCI in Butner since 1988, and had been a clinical psychologist since 1979. (Tr. p. 60). Dr. McBride examined the Defendant in 1992 and 1993 in the capacity of a staff psychologist pursuant to 18 U.S.C. § 4244(b). (Tr. p. 60). The interviews began on December 16, 1992 with an admission evaluation and ended January 13, 1993. (Tr. p. 61).

Dr. McBride talked with the Defendant six times and had the opportunity to visually sit and talk with the Defendant. (Tr. pp. 61, 62).

Dr. McBride testified that he followed a variety of procedures that form the standard for psychological evaluation. McBride testified he had a letter dated 12/31/92 from William McNaull, defense attorney, including a description of a suicide attempt on December 6, 1992[4], the grand jury indictment, itemized list of drug paraphernalia, criminal record. He also completed an interview with Jeffrey Mason, the Defendant's father, a series of letters and notes and cards apparently written six months prior to the suicide attempt, a battery of psychological tests, including an assessment of mental ability; tests designed to assess personality function including MMPI; MCMI and Rorsehach. McBride also had the usual kinds of research and review of specific manuals and other related articles and topics particularly germane to this case, and diagnostic conclusions of the case. (Tr. pp. 62, 63).

Dr. McBride agreed with the statement by defense counsel that he knew under the guidelines of § 4244 that what he was looking for in a narrow sort of view were there mental disease or problems. (Tr. p. 63). He testified that he was required by the statute to confine his evaluation to particular areas. (Tr. p. 63). He stated that these evaluations tend to be very global and comprehensive in nature. They rely on multiple sources of data, and a variety of opinions and conclusions, not solely related to the end question of the statute, become apparent as time proceeds. (Tr. pp. 63, 64).

Dr. McBride agreed interviewing an individual in this capacity you are really not in a vacuum when you are looking at the human condition. (Tr. p. 64).

Dr. McBride testified that these are very global and comprehensive evaluations. They include very in-depth psychological assessments through testing, fairly extensive mental status examinations and clinical impressions. They also review a great deal of material that may not be related to a particu-

---

4. This appears to be an error in the Transcript.

The suicide attempt was in November, 1992.

lar statute. In this particular case, the conversations with Jeff Mason, also a review of the letter regarding the suicide attempt, these would not necessarily be in answer to the specific statute, but a considerable amount of material is generated during these reports. (Tr. p. 64).

Dr. Kathy Williams concurred with his opinion that was sent to the court, date of the report January 29, 1993, concerning Mr. Mason. (Tr. p. 65).

In looking at that opinion, McBride responded to the Court's order as to what Mr. Mason's condition was in light of § 4244, as to whether there were any mental diseases or defects. (Tr. p. 65).

Dr. McBride's response in light of that order and responding to that order was that he viewed Mr. Mason at the time as quite ill and having been quite ill for sometime prior to that, relative diagnostic impression of major depressive episodes, severe without psychotic features, i.e., without serious mental derangement. This was based on history. McBride further testified that it was also largely based on the suicide attempt. This disorder is characterized by rather rapid exacerbation of depressive features. It includes a low mood, it involves inability to effectively communicate with others. There tend to be recurrent thoughts of death, a diminished ability to concentrate. (Tr. pp. 65–66).

Dr. McBride testified Mason stated throughout the evaluation problems with memory and concentration. Additionally in the materials Mason's son provided to him, that were, he believes written maybe six months prior to the actual suicide attempt, McBride saw them to be extremely morose and extremely suicidal. But he thinks the basis primarily for that diagnosis was the attempt of 11/6/92. (Tr. p. 66).

Dr. McBride further testified that beyond that, there was a second diagnostic category that was offered, and that was dysthymia, and dysthymia tends to be a disorder that, by the diagnostic manuals, requires approximately a two-year period of symptoms. (Tr. p. 66). When McBride interviewed the Defendant, as well as his son, they informed

McBride that back in 1989 he experienced a separation from his wife and experienced a great deal of depression. (Tr. pp. 66–67). There was a depressed mood, a poor appetite, inability to concentrate and memory problems as well. Dysthymia tends to be a chronic disturbance, requiring a two-year period of time before it's actually diagnosed. The clinical picture at that time appeared to McBride a sort of flat line of dysthymia, low mood, of depression, that probably existed back in 1989 continued with periodic exacerbations, with those exacerbations being major depression episodes. In practice McBride testified that "we know that individuals suffering from major depressive episodes, fifteen percent of these individuals die by suicide," (Tr. p. 67).

Dr. McBride also testified that it is also known that there is a four fold increase in death rates through suicides for individual fifty-five years of age or older. (Tr. pp. 67–68).

Dr. McBride also testified that if one depressive episode exists, there is a likelihood of fifty to sixty percent that a second one will occur and that in this particular case if you have more than one episode of depression, there is probably a seventy to eighty percent chance of an increase in that episode occurring again. (Tr. p. 68).

So McBride testified that what he saw at that time was a baseline of dysthymia with periodic exacerbations with major depressive episodes occurring and those episodes would include things like suicidal ideation and actual attempts. (Tr. p. 68).

Dr. McBride's third diagnostic impression was alcohol dependence. McBride testified that Defendant told him that he was drinking something like a six pack or twelve pack of beer. (Tr. p. 68).

Dr. McBride testified that Defendant Mason also stated that Mason said he was also drinking three fourths of a fifth of Scotch. McBride testified that Mason said in the beginning rather matter of factly that it wasn't a particular problem. (Tr. p. 68).

Mason denied blackouts, seizures and other kinds of symptoms that would be consis-

tent with that kind of drinking. (Tr. pp. 68–69).

Dr. McBride first saw the Defendant on December 16, 1992, after his suicide attempt on September 6 and approximately two weeks after that McBride formed an opinion. McBride's opinion has not changed up to and including the day of the hearing, April 3, 1996. (Tr. pp. 70, 71, 72, 73). (There is no evidence that McBride has seen Mason since January 13, 1993.)

It is McBride's opinion that based on three disorders which would constitute a mental disease the Defendant was not competent to stand trial in November, 1992. (Tr. p. 73).

Subsequent to his preparation of his report McBride had a conversation with Mr. Vaughn, defense attorney, at which point McBride testified Vaughn discussed some problematic behaviors noted during the trial with Mason. (Tr. p. 75). (McBride did not state what Vaughn had found to be problematic; nor has Vaughn ever mentioned that to the Court).

Dr. McBride never attempted to render a competency evaluation on a retrospective basis before. (Tr. p. 76).

### G. Cross–Examination of Dr. McBride by the Government.

Dr. McBride is no longer at the forensic facility; he is at the federal prison camp. He was transferred about two weeks after his report in the spring of 1993. He is no longer testifying in forensic matters. (Tr. p. 79).

Dr. McBride did not and was not instructed to prepare a competency evaluation. (Tr. p. 79).

A competency evaluation having to do with competency for trial would focus on the period of the trial and Mason's ability to perform certain capacities and functions at the time of trial. (Tr. p. 80).

Dr. McBride has listed in his report the different items McBride relied upon in preparing his evaluation which was for the purpose of determining medical treatment. (Tr. p. 80).

Dr. McBride agreed with the statement that he did not have the benefit of conversations with the AUSA, or the case agent, transcripts of proceedings before this Court, records from the Carolinas Medical Center and other items such as the presentence report that were available to Dr. Hazelrigg. (Tr. p. 80).

Dr. McBride agreed with the statement that what he had done was make a diagnosis as to certain diseases that he says Mr. Mason was suffering from when he examined him in early Spring 1993. (Tr. pp. 80, 81).

Dr. McBride agreed that someone can be an alcoholic and be competent to stand trial, that someone can suffer from dysthymia and be competent to stand trial if he is capable of meeting the criteria for competency (Tr. p. 81), the criteria for competency is independent of the disorder itself because they are different questions. (Tr. p. 81).

Competency goes to whether they (the defendants) understand the proceeding and whether they are aware of the consequences of the proceeding as well as being able to assist in their own defense. (Tr. pp. 81, 82).

Dr. McBride did not have the benefit of the transcripts from any of the hearings pertaining to this case when he made his assessment.

### H. Redirect Examination of Dr. McBride by the Defendant.

Dr. McBride agreed with defense counsel's statement that Dr. McBride conducted on Mr. Mason was not conducted in a vacuum. (Tr. p. 83).

Dr. McBride's examination of Mason was extremely close to the time of trial. It would by nature be a retrospective evaluation. It was not occurring at the time to assess—it was not actually occurring to assess competency, but it was a report that was extremely close to a suicide attempt and reflected some very serious pathology. (Tr. pp. 83, 84).

Dr. McBride agreed with counsel's statement that it was McBride's opinion he (the Defendant) was not competent at the time of trial in November of 1992. (Tr. p. 84).

## III. *FINDINGS OF FACT*

### A. *The Forensic Evaluation Report.*

1. In response to the Court's Order of December 6, 1995, the Defendant was admitted to the Mental Health Division of the Federal Correctional Institution in Butner, North Carolina, on January 4, 1996. (See Forensic Evaluation Report on Paul Eugene Mason dated February 16, 1996. That report will be referred to hereinafter as "FER".)

2. Mason was interviewed individually by Dr. Mark Hazelrigg, Ph.D., Clinical Psychologist with psychiatric evaluation by Jean Zula, M.D., Staff Psychologist. (FER 1).

3. Other members of the Forensic Team, Correctional Mental Health Staff also had an opportunity to observe his behavior throughout the course of his evaluation and in a forensic case review held on February 13, 1996. Their comments were considered prior to the preparation of the report. The following assessment procedures were conducted for the evaluation: clinical interviews, physical examination and Minnesota Multiphasic Personality Inventory ("MMPI"). *Id.* p. 1.

4. Prior to 1992, Mason had no contact with mental health professionals. Between 1989 and 1991 his mood was down and he had marital problems, had difficulty sleeping, and his work productivity declined. His consumption of alcohol was maintained in a high level with daily consumption of at least one half bottle of Scotch and six to 12 beers. He reported suicidal ideation during times of stress or conflict but had no specific plan or intent. *Id.* p. 2.

5. As the trial approached Mason claimed increased drinking of alcohol, estimating that he drank an entire bottle of Scotch during the day with additional beers as well. Mason stated he drank in the morning, during breaks in the trial, and at lunch, and throughout the evening. *Id.* p. 2.

6. He reported although he had blackouts and memory loss in the past drinking binges. He did not report any of those problems during the trial. His counsel, Vaughn, reported that Mason did not testify at his trial for strategic reasons, "not because he was drunk." *Id.* p. 2.

7. Prior to trial Mason expressed suicidal ideation to his counsel Mr. McNaull who stated that he did not think it was unusual for someone in Mason's position to talk about suicidal ideas. Mason acknowledged suicidal ideation before the trial, but denied that he had any during the actual trial. *Id.* p. 3.

8. The FER states Mason would laugh derisively or make gestures during the trial to express his disgust at the situation. The FER states Mason would also arrive late to Court much of the time and would return late after breaks. *Id.* p. 3. Based on the Court's observations, the FER is in error on this point. The fact is the Court did not observe any aberrant conduct by Defendant.

9. Mason picked up his attorney Vaughn from the hotel each morning and brought him to court. He listened to the testimony and was able to analyze whether or not it was true. He could communicate his beliefs to his attorney and participate in meetings in the evening and during recesses. *Id.* p. 3.

10. Mason clearly recalls witnesses who testified, the content of their testimony, and discussion he had with his attorneys about the testimony. *Id.* p. 3.

11. Mason described being aware he was not taking his trial as seriously as his attorneys and son wanted. He stated he thought his attorneys were doing a good job, but also recalled being aware they had many motions denied. *Id.* p. 2.

12. Mr. Vaughn observed his client closely during the trial and later (after the suicide attempt) in subsequent hearings, such as sentencing, but could not describe any significant difference in his behavior between those two periods. *Id.* p. 3.

13. Vaughn stated that during both times Mason made promises but did not follow through, and seemed to feel that he had nothing to fear. Vaughn did not describe severely disordered behavior or thought processes. *Id.* p. 3.

14. When Mason stabbed himself, he was found with a note which expressed his belief the justice system was unfair, claims that

witnesses lied, and denial of wrongdoing. *Id.* pp. 3, 4.

15. In the report dated 1/29/93, Dr. McBride made the diagnoses of Major Depressive Episode, Severe possible Dysthymia (principal diagnosis); and alcohol dependence. It was recommended that Mason receive ongoing treatment for these disorders in inpatient facility. *Id.* p. 4.

16. Mason was evaluated on 4/08/93 by Dr. Owens regarding his competency to proceed with sentencing. *Id.* p. 4.

17. Dr. Owens revised the diagnostic formulation by McBride to include Alcohol Dependence as the principal diagnosis. Rather than major depression, Mason was diagnosed with Adjustment Disorder with Depressed Mood, and also of a personality disorder. Mr. Mason's mood disorders and alcohol dependence were considered to be in remission at the time of the April 8, 1993 evaluation by Dr. Owens at Butner and it was not thought that they would interfere with Mr. Mason's competency to participate in future legal proceedings or sentencing. *Id.* p. 4.

18. Mason's intellectual ability appeared to be in the average range. Memory for recent and remote events was very good, including accurate recall of telephone numbers and detailed recall of the events during and after his trial. *Id.* p. 6.

19. Mason was able to accurately describe the circumstances leading up to charges being filed against him. He could accurately discuss the nature of his current situation and the rationale for evaluating his competency to stand trial during 1992. *Id.* p. 6.

20. Mason demonstrated a detailed understanding of the nature and object of the criminal court proceedings and could explain the roles of various courtroom participants, such as the prosecuting and defense attorneys, the judge, the jury and the witnesses. *Id.* p. 6.

21. Mason could explain the conditions under which testimony occurs and understood cross-examination. *Id.* p. 6.

22. Mason showed an adequate attentional ability and capacity to comprehend and follow instructions such that he should be able to participate in a courtroom procedure. He demonstrated the ability to understand basic legal rights and decisions, interpret witnesses' testimony, and testify in his own behalf. Mason expressed a willingness to work with his attorneys and expressed confidence in them. *Id.* p. 6.

23. It does not seem Mason experienced any depressive symptoms in the absence of extreme stress, and there is a clear pattern of increasingly severe depressive symptoms as the problems in his life became more extreme. This pattern culminated in his conviction, an event he was unable to cope with, resulting in the suicide attempt. Taken as a whole, these circumstances are best described as being an Adjustment Disorder with Depressed Mood. *Id.* p. 8.

24. Major Depression and Dysthymia are both ruled out because of the close connection between stressful events and the onset or worsening of symptoms. *Id.* p. 8.

25. A previous report (by McBride) had predicted that Mason would require inpatient hospitalization because of his depressive disorders. Since that time Mason has proven to be capable of functioning without inpatient hospitalization, providing further evidence that he did not suffer from those disorders. Since being treated with antidepressant medication, Mason's depressed mood and other symptoms have resolved and remain in remission. *Id.* p. 8.

26. Mr. Mason presented with enduring personality traits that are maladaptive and cause problems in his interpersonal relationships. He has a sense of being entitled to favorable treatment, being exploitive of others to achieve his own ends, lacking empathy for the impact of his behavior on others and showing arrogant and haughty attitudes. These traits are all associated with Narcissistic Personality Disorder, but Mason does not meet the full diagnostic criteria for that diagnosis. *Id.* p. 8.

27. In the opinion of the examiners, Mr. Mason did suffer from Alcohol Dependence and an Adjustment Disorder with Depressed Mood during his trial in November 1992. The depressive symptoms he was experienc-

ing were limited at that time and were overshadowed by his alcohol consumption. The depressive symptoms did not escalate to an extreme level until after the guilty verdict. Prior to that, Mr. Mason had expressed optimism about the outcome of the trial and was not expressing hopelessness or suicidal intent. Thus, the Adjustment Disorder with Depressed Mood did not have a significant impact on Mr. Mason's competency during the trial. Similarly, Mr. Mason was drinking during his trial, but did not appear to be intoxicated to a degree that prevented him from active participation in the defense. He reported that he was drinking during the day and during breaks in the trial, but indicated that this was typical for him and that he had consumed alcohol in this pattern for many years while running a business. Despite his possible intoxication, Mr. Mason was able to attend to witnesses' testimony, judge the truthfulness of the testimony, communicate his thoughts to his attorneys, and participate in meetings with his attorneys. In addition, he was able to dress appropriately for court, drive to court each morning, and pick up his attorney from the hotel. Mr. Mason's irresponsible behavior, cavalier attitude about the trial, and mildly disruptive behavior during court were not related to any severe mental disease or defect. *Id.* p. 8.

28. That behavior resulted from Mr. Mason's narcissistic personality traits, but could also have been worsened by the disinhibiting effects of alcohol. *Id.* p. 9.

29. In summary, Mr. Mason had two conditions during his trial in 1992: Adjustment Disorder with Depressed Mood and alcohol intoxication. It is the opinion the [sic] Mr. Mason's Adjustment Disorder with Depressed Mood did not interfere with his ability to stand trial. This condition became severe only after his conviction. Second, Mr. Mason may have been intoxicated at some points in his trial. Although it is likely that he could have provided additional assistance to his attorneys and helped develop a stronger defense if he had not been drinking at all, he was never so intoxicated that he was totally impaired. *Therefore, while his participation in the trial may not have been optimum, the present examiners believe it was adequate and the effects of his adjustment disorder and alcohol consumption did not render Mr. Mason unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. Id.* p. 9.

30. Collateral information available for Hazelrigg and his team to review included copies of the Court Order dated 12/06/95; Grand Jury Indictment; Judgment in a Criminal Case, 06/28/93; Presentence Report, prepared by John Dunne, USPO, 05/05/93; published decision of the Fourth Circuit Court of Appeals, *United States v. Mason,* 05/09/95; Briefs from the defense and AUSA submitted to the Court of Appeals; Medical Transfer Summary from FMC Rochester, 11/09/95; Affidavit of William McNaull, Jr., 04/09/93; Affidavit of Robert Vaughn, 04/16/93; investigation reports compiled by David Wilhelm, Special Agent, U.S. Customs Service; Forensic Evaluation by Kevin McBride, Ph.D., 01/29/93; Forensic Evaluation by Thomas Owens, M.D., 04/08/93; Transcript of proceedings before Judge Potter, 02/22/93; Medical Records from the Carolinas Medical Center, 11/06/92 to 11/23/92; handwritten notes from Mr. Mason, written during the time of his trial in November 1992; handwritten notes from Mr. Mason's wife during November 1992; telephone conversations with Mason's son Jeffrey, 01/29/96 and a telephone conversation with Mr. McNaull 02/01/96. *Id.* p. 2.

**B. Testimony at April 3, 1996 Competency Hearing.**

31. Dr. McBride did not and was not instructed to prepare a competency evaluation. (Tr. p. 79).

Retrospective evaluations are not unusual. A very common evaluation of the mental state of the Defendant at the time of the offense is always retrospective in nature. The issue of competency is not any more or less detailed or more or less difficult. They both involve the same issues. (Tr. p. 11).

Dr. Hazelrigg had conducted retrospective evaluations many months or even years in the past. (Tr. p. 11). It is hypothetical to say that it would have been of greater value to Hazelrigg in his report to have been able

to have interviewed the Defendant in December 1992 and January 1993. (Tr. pp. 16, 17).

32. Dr. McBride's report focused on what treatments would be appropriate for a man with the problems he identified in Mason. (Tr. p. 80).

33. Dr. McBride did not have the benefit of conversations with the AUSA, or the case agent, and did not have transcripts of the proceedings before this Court. Dr. McBride did not have the records from the Carolinas Medical Center, and other items such as the presentence report that were available to Hazelrigg. (Tr. p. 80). Hazelrigg had the CMC records and reviewed them. (Tr. p. 42). CMC was the hospital to which Mason was taken after his suicide attempt. (See FER p. 1; TR. pp. 18, 20, 21).

34. Dr. McBride agreed that what he had done was make a diagnosis as to certain diseases that he says Mason was suffering from when he examined him in early Spring 1993. (Tr. pp. 80, 81).

35. Dr. McBride agreed that someone can be an alcoholic and be competent to stand trial, that someone can suffer from dysthymia and be competent to stand trial if he is capable of meeting the criteria for competency, the criteria for competency being independent of the disorder itself because they are different questions. (Tr. p. 81).

36. Competency goes to whether a defendant understands the proceeding and whether he is aware of the consequences of the proceeding as well as being able to assist in his own defense. (Tr. pp. 81, 82).

37. Dr. McBride's examination was close to the time of the trial. It was not actually occurring to assess competency. (Tr. pp. 83, 84). Dr. Hazelrigg worked with Dr. Zula, M.D. Dr. Zula concurred with Dr. Hazelrigg that Mason was competent in November 1992. (Tr. p. 32).

38. From the Court's observation of the Defendant during trial, there was no display of irrational behavior, or other indication that the Defendant did not understand the nature of the proceedings. Neither during the trial nor at sentencing did the Court observe any conduct by the Defendant which indicated he was not aware of the consequences of the proceeding, he conferred with his attorneys from time to time and appeared to be listening to the testimony.

39. Dr. Hazelrigg spoke with defense attorneys McNaull and Vaughn and took detailed notes of those conversations. He does not recall either of them stating there were a lot of things they could not remember after three years. (Tr. p. 37).

40. The fact that Dr. Williams and Dr. McBride had given an opinion did not cause Hazelrigg to feel it necessary to speak with either of them since he had their written evaluations, all their progress notes and the opportunity to go to the primary sources and address the issue directly. (Tr. p. 46).

41. Mason picked up his attorneys McNaull and Vaughn each morning and brought them to court. (Tr. p. 19).

42. Mason was running his business. (Tr. p. 24).

43. Mason was in Rochester Federal Prison for a medical procedure (the repair of an aortic aneurism) and was not in the mental health facility; therefore Hazelrigg did not review the records from Rochester. (Tr. p. 26). That period of time was not relevant to Hazelrigg's evaluation. (Tr. p. 27).

44. One of the psychologists at Rochester, however, recalled talking with Mason and did not report anything unusual to Hazelrigg about the admission. (Tr. pp. 26, 27).

45. Dr. McBride's evaluation was not intended to evaluate Mason's competency at time of trial. (Tr. pp. 40–41).

46. Defense Attorney Vaughn apparently had no basis for questioning Hazelrigg about two suicide attempts while Mason was at FCI Rochester, Minnesota. (See Tr. pp. 25, 26; p. 41, lines 24–25; and p. 42, lines 1–16).

47. The trial transcript was not reviewed by Hazelrigg because Mason did not testify and thus there is no real record of his behavior that would be in the transcript. (Tr. p. 36) (See FF 6) [5].

5. "FF" refers to Findings of Facts.

48. One defense attorney, Vaughn, told the Court on November 6, 1992 that when he moved for Mason's release pending appeal he did not have any idea of any suicidal tendencies on his part at that time. (Trial Tr. p. 679, lines 24–25). A few minutes later, on the same day, the other defense attorney, McNaull, told the Court that Mason had been suicidal from the first day McNaull talked to him. (Trial Tr. p. 681, lines 21–23).

49. Defendant's son, Jeffrey Mason, is the only person Hazelrigg could find throughout his notes that stated Mason was late (to court) on a consistent basis. Neither Mason, McNaull, Vaughn, or Shappert reported Mason was late. (Tr. p. 48).

50. Dr. McBride viewed Mason as quite ill with a diagnosis of Major Depressive Episodes *without* Psychotic Features, (Tr. pp. 65–66). Psychosis is a serious mental derangement. (Webster's Dictionary of the English Language (1989)). Therefore, Mason was not diagnosed by McBride as having serious mental derangement.

51. Dr. McBride's primary basis for his opinion that Mason was extremely morose and extremely suicidal was based on the attempt in November 1992. (Tr. p. 66).

52. Dr. McBride's second diagnostic category was that of dysthymia, low mood, depression. (Tr. p. 66).

53. Dr. McBride's third diagnostic impression was alcohol dependence. (Tr. p. 68).

54. Dr. McBride's opinion was that, based on those three disorders, which would constitute a mental disease, Mason was not competent to stand trial. (Tr. p. 73).

55. Dr. McBride had never attempted to render a competency evaluation on a retrospective basis before. (Tr. p. 76).

## IV. *DISCUSSION*

### A. *Title 18, Section 4241 Standard.*

■ The standard in 18 U.S.C. § 4241 governs whether the competency issue is raised before or after trial. *United States v. Mason*, 52 F.3d 1286 (4th Cir.1995), citing *United States v. Renfroe*, 825 F.2d 763 (3d Cir.1987).

In *Renfroe* trial attorneys testified to defendant's inability to aid in structuring his own defense. *Id.* p. 767. On the other hand, Mason's attorneys, neither of them, have ever made any statement to the Court that Mason was unable to communicate with them or consult with them or did not have a rational as well as a factual understanding of the proceedings against him. Their client has been convicted and now they want to contest the conviction by having this Court make a determination that Mason was not competent to stand trial.

In *Mason* the Defendant picked up his attorney Vaughn from the hotel each morning and brought him to court, listened to the testimony and was able to analyze whether or not it was true. He could communicate his beliefs to his attorneys and participate in meetings in the evenings and during recesses. (FF 8). Mason clearly recalled witnesses who testified, the content of their testimony, and discussions he had with his attorneys about the testimony. (FF 9).

Mason described being aware he was not taking his trial as seriously as his attorneys and son wanted. (FF 10).

Mason's attorney, Vaughn, observed his client closely during the trial and later in subsequent hearings, such as sentencing (which was after Dr. Owens at FCI Butner found him competent to participate in sentencing) but could not describe any significant difference in his behavior between those two periods. (FF 11). Vaughn did not describe severely disordered behavior or thought processes. (FF 12).

The Court does not recall any irrational conduct by Mason during the trial, and the trial transcript does not reflect any. It is this Court's usual pattern, if the Court does witness any fractious conduct by any party or attorney, to reprimand the person engaging in the conduct outside the hearing of the jury and on the record. The Court is aware that Dr. Hazelrigg in his report on page 3 recites that the Defendant engaged in derisive laughter and made gestures. However, if the Court had observed derisive laughter, or that Defendant made any type of gesture or engaged in any untoward conduct, it would certainly have been brought to the

attention of Mason and his attorneys on the record. Dr. Hazelrigg was basing this statement on what others told him. Neither the Court, the Assistant United States Attorney, nor Wilhelm, the Government's agent, has referred to this behavior.

There is one other matter on this point. Mason's counsel McNaull in his "Response of Defendant," filed June 5, 1996 refers to page 679 of the transcript wherein this Court stated "He tends to be late all the time." Again, if he had been, this Court would have reprimanded him and admonished him to be on time, and this would have appeared in the record. The Court does seem to recall that on some occasions after a break, the Defendant would be coming down the aisle from the back of the courtroom as the jury was coming into the box. (See n. 3, p. 6 of this Memorandum). Thus, the comment as to his being late was in all probability based on that fact. The Court's memory of Mr. Mason's promptness is substantiated by the Assistant United States Attorney and Agent Wilhelm.

**B.** *Meaningfulness of Nunc Pro Tunc Competency Determination.*

■ The Court finds that a retrospective determination of Mason's competence during the first phase of the trial is possible.

Dr. Hazelrigg and his team had a plethora of information on Mr. Mason for their review dating back to 1992. (FF 30).

■ The testimony at the competency hearing on April 3, 1996 convinced the Court that it was possible for a retrospective determination of Mason's competence during the first phase of his trial. As a matter of fact as Dr. Hazelrigg testified retrospective examinations are not in general unusual. A very common evaluation by Dr. Hazelrigg is the mental state of the defendant at the time of the alleged offense, which is always retrospective in nature. (FF 31; Tr. p. 11, lines 13–18). "Although retrospective competency hearings are generally disfavored, *see Drope,* 420 U.S. at 183, 95 S.Ct. at 909, such a determination may be possible where, as in this case, the defendant's treating physicians have already conducted an inquiry into the defendant's competence at the time of the

first phase of the trial." *United States v. Mason,* 52 F.3d 1286, 1293 (4th Cir.1995).

Understandably, hard and fast rules in this area have not been formulated. Like the determination of competency itself, the question of meaningfulness can be answered only by a full review of the facts of each case, taking into account the quality and quantity of available data as well as the opinion of experts.

Although clearly relevant, the time factor is not determinative. *Compare Carroll v. Beto,* 330 F.Supp. 71 (N.D.Tex.1971), *aff'd,* 446 F.2d 648 (5th Cir.1971) (meaningful hearing possible 23 years after trial) with *Clark v. Beto,* 283 F.Supp. 272 (S.D.Tex.1968), *aff'd,* 415 F.2d 71 (5th Cir. 1969) (no hearing possible after a lapse of 8 years). The passage of even a considerable amount of time may not be an insurmountable obstacle if there is sufficient evidence in the record derived from knowledge contemporaneous to trial. *Conner v. Wingo,* 429 F.2d 630 (6th Cir.1970), *cert. denied,* 406 U.S. 921, 92 S.Ct. 1779, 32 L.Ed.2d 121 (1972). Especially when defendant's mental state was at issue, the transcript of the trial itself may provide a solid starting point for reliable reconstruction of the pertinent facts. *Lee v. Alabama,* 386 F.2d 97, 112 (5th Cir.1967) (*en banc* ) (Thornberry, J., concurring). Mental examinations conducted close to the trial date, of course, increase the probability that the *nunc pro tunc* hearing will not be unduly speculative. *Holloway v. United States,* 119 U.S.App.D.C. 396, 343 F.2d 265 (1964). Likewise, the recollections of non-experts (including the observations of the trial judge) who had the opportunity to interact with defendant during the relevant period may in some instances provide a sufficient base upon which a fact-finder may rest his decision that even a belated determination will be accurate.
*United States v. Makris,* 535 F.2d 899, 904–905 (5th Cir.1976).

**C.** *Burden of Proof.*

■ The burden of proof of competency is on the Government to prove competency by a preponderance of the evidence. *United States v. DiGilio,* 538 F.2d 972 (3d Cir.1976);

*United States v. Makris,* 535 F.2d 899 (5th Cir.1976).

### D. *The Test of Competence.*

The Supreme Court in *Drope v. Missouri,* 420 U.S. 162, 172, 95 S.Ct. 896, 904, 43 L.Ed.2d 103 (1975) held:

> ... as to federal cases, we have approved a test of incompetence which seeks to ascertain whether a criminal defendant " 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.' " *Dusky v. United States,* 362 U.S., [402] at 402 [80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960) ].

██ In this case, Mason's attorney, Vaughn, did not describe severely disordered behavior or thought processes. Mason was able to attend to witnesses' testimony, judge the truthfulness of the testimony, communicate his beliefs to his attorneys and participate in meetings with his attorneys in the evenings or during recesses. In addition, he was able to dress appropriately for court, drive to court each morning and pick up his attorney from the hotel. Mr. Mason's irresponsible behavior, cavalier attitude about the trial, and mildly disruptive behavior during court were not related to any severe mental disease or defect but rather to his sense of being entitled to favorable treatment, being exploitive of others, lacking empathy for the impact of his behavior on others and showing arrogant and haughty attitudes. These traits are all associated with Narcissistic Personality Disorder, but Mason does not meet the full diagnostic criteria for that diagnosis. (FF 9, 13, 26, 27, 28). Mason's counsel, Vaughn, reported that Mason did not testify at his trial for strategic reasons, not because he was drunk. (FF 6). Mason expressed suicidal ideation to his counsel McNaull, who stated that he did not think it was unusual for someone in Mason's position to talk about suicidal ideation. (FF 7). Mason's attorney, Vaughn, observed his client closely during the trial and later in subsequent hearings, such as sentencing, but could not describe any significant difference in his behavior between those two periods. (FF 12).

Dr. McBride's purpose in examining Mason in light of 18 U.S.C. § 4244 was to determine whether there were any mental disease or defect. His diagnosis was of Major Depressive Episodes, severe with psychotic features. This diagnosis was largely based on the suicide attempt. (FF 51; Tr. pp 65–66). Dr. McBride also diagnosed dysthymia—defined as melancholy or mental perversion. This does not equate with inability to consult with lawyer with a reasonable degree of rational understanding. In fact, the evidence is that Mason could understand the testimony, judge its truthfulness, and communicate his beliefs to his attorneys. Dr. McBride's diagnosis was in essence depression and alcohol dependence—in the abstract a low mood. Dr. McBride admitted his evaluation was not occurring at the time to assess competency. (Tr. pp. 83, 84). Yet, he gives an opinion that Mason was not competent to stand trial with no further explanation. The Government on the other hand has shown by a preponderance of the evidence that Mason was competent to stand trial as that term is defined by the Supreme Court.

Dr. McBride never defined what he meant when in his final answer he testified as follows in answer to defense counsel Vaughn's questions:

Q. Your contact with Mr. Mason, as I think we have said, was not thirty-nine months distant. Rather, it was a matter of weeks, no more than four or five weeks after his attempted suicide you initiated discussion with him. Is that correct?

A. That's correct. It was relatively recent to his suicide attempt.

Q. So, would we say that your analysis of Mr. Mason in your opinion that you are offering here today was a contemporaneous opinion, virtually contemporaneous to the condition as it existed in November of 1992.

A. It was extremely close to the time of trial.

Q. Would you refer to your opinion that you are offering the Court today as a "retrospective" opinion?

A. Well, it would by the—by nature be a retrospective evaluation in that it wasn't occurring at the time to assess—*it wasn't actually occurring to assess competency* (emphasis added), but it was a report that was extremely close to a suicide attempt and reflected some very serious pathology.

Q. Do you have anything further you want to share with this Court concerning Mr. Mason's competency at the time of trial?

A. No.

Q. But indeed it is your opinion he was not competent at the time of trial in November of 1992?

A. That's correct.

(Tr. p. 83, lines 9–25; p. 84, lines 1–10).

McBride did not define competency for trial. He was not instructed to prepare a competency evaluation for trial however he defines it. (Tr. p. 79). McBride's report was designed to focus on what treatment would be appropriate for a man with the problems he identified in Mason. He did not have the benefit of conversations with the Assistant United States Attorney, transcripts of the proceedings before Judge Potter, records from the CMC, and other items such as the presentence reports that were available to Dr. Hazelrigg. (Tr. p. 80). McBride has never attempted to render a competency evaluation on a retrospective basis before. (Tr. p. 76).

In the record of the hearing held by this Court on February 22, 1993, the Court pointed out that the warden of FCI Butner stated in his letter to the Court that the opinion of the psychologists at that facility was that Mr. Mason was suffering from a mental disease or defect as a result of which he was in need of custody, care and treatment. (See Tr. *2/22/93* hearing, p. 2).

The Court on its own motion determined that before sentencing Mason would have to be sent back. *Id.* p. 2.

The Court also at that time denied defense motion that a retrospective examination on the question of competency during trial be denied stating "I don't think there's any evidence of anything during the trial itself of any mental infliction [sic] during the trial."

*Id.* p. 3, line 25; p. 4, lines 1–2. The Court further stated:

THE COURT: I don't think there is sufficient evidence here to warrant granting any motion for a new trial. It's going to be right difficult, as counsel just said, to determine at this time whether he was competent back in November. That was something that should have been brought up then.

I noticed nothing during this trial to indicate anything, any incompetence on the part of the defendant, and the question is whether or not he could consult with you during the trial, which he apparently did, because you never said anything about it, neither one of you, and I'm not going to grant a motion for a new trial. *Id.* p. 7, lines 19–25.

In view of the report which we received, which doesn't state one way or the other, as I can see it, whether he was competent to be sentenced, I guess out of an abundance of precaution I feel like he should be sent back over there to be evaluated again.

In fact the letter says he requires a lengthy period of psychotherapy, possibly augmented with medication, in order to resolve or gain control of the factors which led to his current evaluation. No odd verbalizations, neologisms or flight of ideas were noted. Thoughts were organized somewhat loosely but coherent. Judgment and insight were viewed as adequate. Symptoms of depression to be ongoing but with some improvement. On discharge, Mr. Mason is alert, oriented and in no acute distress. His speech now is to the point and goal directed without clear evidence of circumstantiality or tangentiality. Thoughts are organized an [sic] coherent. He denies suicidal ideation and does not appear to be an imminent suicide risk. Full Scale IQ 93, Performance IQ 84, and Verbal IQ 101. He appears to function best in the area of practical judgment or common sense. He has fewer resources available than most people and has a very negative self-concept or image. For these reasons we off [sic] the diagnosis of Alcohol Dependence. (*Id.* p. 8, lines 1–25).

## V. SUMMARY

The Defendant, Paul Mason, was tried by a jury and convicted on November 5, 1992 on all but two counts in the indictment of importation and sale of drug paraphernalia and participation in drug distribution conspiracy in violation of Federal law.

The Government moved for custody. The Defendant's attorney Vaughn argued that Mr. Mason was a property owner, he owned his own business and the business continues to this day. The Court did not take Mr. Mason into custody. (Trial Tr. p. 678). As the record indicates, the forfeiture hearing was scheduled to commence the next morning at 10:00 a.m. (*Id.* p. 678, 679). Even though it does not appear of record, the Court recalls based on defense counsel's statements that it did not feel the Defendant was any risk of flight or danger to any other person over night and released the Defendant on his own recognizance.

It was the next morning just before court that the Defendant was found to have put a knife into his chest in the parking lot next to the courthouse. Court was recessed in this matter until there could be a determination of Mason's condition. (*Id.* pp. 679–685).

In a court order by the Magistrate on November 30, 1992, the Magistrate ordered an examination of Mr. Mason to determine the presence of a mental disease or defect which would require custody for care or treatment in a suitable facility as well as sentencing alternatives that could best afford the Defendant the kind of treatment needed. (See Forensic Evaluation filed February 17, 1993). This report was prepared by Dr. Kevin McBride, Ph.D., Clinical Psychologist at Butner, and Cathy Williams, M.D., Staff Psychiatrist, at the same institution.

Since the report did not give any definitive answer to the question of Mason's competency to stand trial for the remaining forfeiture phase of the trial, the District Court, *sua sponte,* amended the Magistrate's Order on February 23, 1993 indicating Mason should be returned to the custody of the Attorney General pursuant to 18 U.S.C. § 4241 rather than § 4244.

When Mason was returned to Butner for further evaluation under § 4241, the evaluation was performed and the report dated April 8, 1993 was prepared by Thomas D. Owens, M.D., Staff Psychiatrist, and Rushton A. Becker, Ph.D., Staff Psychologist, and filed in this Court on April 29, 1993. That report found that his functioning during the evaluation period suggested that he is capable of effectively working with his attorney and the opinion that he is currently competent for sentencing.

The Court held a competency hearing for purposes of the forfeiture phase of the trial and sentencing and found that Mason was competent to stand trial for the forfeiture proceeding and sentencing.

Dr. McBride, by his own testimony, was not ordered to and did not in his report dated January 29, 1993 assess the competency of Mason to stand trial in November 1992, as that term has been defined by the Supreme Court. Dr. McBride's evaluation of Mason was as follows:

*IMPRESSIONS:* According to the *Diagnostic and Statistical Manual of the American Psychiatric Association, Third Edition Revised,* we view Mr. Mason as follows:

Axis I: 1) Major Depressive Episode, Severe, without Psychotic Features, 296.23

2) Possible Dysthymia, 300.40 (Principle Diagnosis)

3) Alcohol Dependence, 303.90

Axis II: Deferred

Axis III: Hypertension; Chronic Lower Back Pain; Refractive Error; Status post Abdominal Surgery in 11/92; Increased Cholesterol and Triglyceride levels

*Id.* pp. 6, 7.

■ Major Depressive Episodes, possible Dysthymia and Alcohol Dependence, his sense of being entitled to favorable treatment, being exploitive of others to achieve his own ends and showing arrogant and haughty attitudes (FF 26) do not equal being incompetent to stand trial and do not satisfy the legal test for competence; *i.e.,* whether the criminal defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding

and whether he has a rational as well as a factual understanding of the proceedings against him.

On the other hand, Dr. Hazelrigg in consultation with Dr. Zula, after receiving input from the Correctional Mental Staff and the Forensic team who had the opportunity to observe Mason's behavior conclude that the effects of Mason's adjustment disorder and alcohol consumption did not render Mason unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

Therefore, McBride's statement in answer to defense counsel's leading question, opining that Mason was not competent to stand trial in November 1992 is at best speculative and is not entitled to the weight of the evidence of the opinion of Drs. Hazelrigg and Zula, M.D., Staff Psychiatrist, who were ordered to perform a retrospective evaluation to determine the competency of Mason in November 1992 and who had available to them the information as set out in FF 30.

## VI. *CONCLUSION*

The Court concludes that a retrospective determination of Mason's competence during the first phase of the trial is possible, and that the Government has met its burden of proof by a preponderance of the evidence and finds that Mason was competent to stand trial in November 1992.

**NOW, THEREFORE, IT IS ORDERED** that Defendant's Motion for a New Trial be, and hereby is, *DENIED.*

**IT IS FURTHER ORDERED** that Defendant **PAUL EUGENE MASON** remain in custody of the Attorney General in accordance with this Court's Judgment dated June 28, 1993 unless he is ordered released by a court of competent jurisdiction.

The Clerk is directed to certify copies of this Memorandum and Order to Defendant, defense counsel, the United States Probation Office, the United States Marshal, the Warden at FCI Butner, and the United States Attorney.